STATE OF NORTH CAROLINA v. HENRY N. JARRETTE

No. 46

(Filed 25 February 1974)

**1. Criminal Law § 92— four offenses — consolidation for trial**

The trial court did not err in consolidating for trial charges against defendant for murder, rape, kidnapping and armed robbery where the offenses constituted a continuing criminal episode lasting some two and one-half hours and were so related in time and circumstance as to permit the admission in evidence of each in the trial of the others. G.S. 15-152.

**2. Criminal Law § 15; Jury § 2— change of venue — special venire**

The trial court in this prosecution for murder, rape, kidnapping and armed robbery did not abuse its discretion in the denial of defendant's motion for a change of venue or for a special venire from another county on the ground of pretrial publicity where the newspaper stories relating to the crimes were within the normal limits of newspaper reporting of criminal activity, the circumstances under which the crimes were committed attracted the attention of all news media of the State, and defendant offered no evidence that such publicity was more widespread in the county of trial than in any other county to which the case might have been removed in accordance with G.S. 1-84.

**3. Criminal Law § 15— improper venue — waiver — motion for venue change because of local prejudice**

Although another county was the proper venue for trial of defendant on a kidnapping charge, defendant waived venue by going to trial without requesting transfer to the proper county, defendant's motion for change of venue on the ground of local prejudice not being such a request.

625

State v. Jarrette

**4. Jury § 6— motion to question prospective jurors separately, out of presence of other jurors**

The trial court did not abuse its discretion in the denial of defendant's motion that prospective jurors be questioned separately, out of the presence of other selected or prospective jurors, on the ground a prospective juror might refer during the *voir dire* to what he had read or heard through the news media concerning the defendant's being an escaped prisoner.

**5. Jury § 6— prospective jurors — questions concerning views on capital punishment**

In this prosecution for murder, rape, kidnapping and armed robbery, the trial court did not err in permitting the solicitor to propound questions to prospective jurors concerning their views about the death penalty.

**6. Constitutional Law § 29; Criminal Law § 135; Jury § 7— jurors opposed to capital punishment — challenge for cause**

In a prosecution for murder and rape, the trial court properly allowed the State's challenges for cause to prospective jurors who stated, in effect, that under no circumstances could they vote for a verdict which would result in the imposition of the death penalty.

**7. Criminal Law §§ 34, 128— motion for mistrial — statement by prospective juror**

The trial court did not err in the denial of defendant's motion for a mistrial made on the ground that a prospective juror stated, in the presence of other prospective and selected jurors, that he remembered, he believed, having read that defendant had been declared an outlaw.

**8. Jury § 7— challenge for cause — juror who saw television news report about trial**

The trial court did not err in the denial of defendant's challenge for cause to a juror who had seen a television news report about the case the night before he was called into the jury box where defendant's interrogation of the juror developed no information indicating any prejudice against defendant or any preconceived idea concerning his guilt or innocence, and the juror stated upon inquiry by the court that he could give defendant a fair and impartial trial without being influenced by what he had previously heard.

**9. Criminal Law § 73— declaration of decedent showing intent — exception to hearsay rule**

In a murder prosecution wherein the State's evidence tended to show that the victim was stabbed by defendant while sitting in his brother's car at a launderette, testimony by the victim's brother that, when he borrowed the car and immediately before driving off in it, the victim said he was going to the launderette was admissible as an exception to the hearsay rule and as a part of the *res gestae* of the borrowing and departure.

**10. Criminal Law § 66— pretrial photographic identification — in-court identification — independent origin**

An officer's in-court identification of defendant as the driver of a car which the officer pursued was properly admitted, though the

State ·v. Jarrette

officer had identified defendant from photographs, where the officer's testimony was based on what he saw in the course of his pursuit of the car, there is nothing in the record to indicate that the photographs or· the circumstances under which the officer saw them were impermissibly suggestive and there is nothing to indicate a substantial likelihood of irreparable misidentification through· inspection of the photographs.

11. **Criminal Law § 34— nonresponsive testimony disclosing defendant is prison escapee**

. In a prosecution for murder, rape, kidnapping and armed robbery, the trial court did not err in the denial of defendant's motion for mistrial made on the ground that an F.B.I. agent's nonresponsive statement implying that defendant had escaped from prison constituted inadmissible evidence that defendant had committed a prior criminal offense where the court properly instructed the jury not to consider such statement.

12. **Criminal Law §§ 34, 75— confessions — statements that defendant was prison escapee**

In this prosecution for murder, rape, kidnapping and armed robbery, the trial court did not err in the admission of written· and oral confessions containing statements by defendant to the effect that he had escaped from prison where defendant interposed only general objections to testimony relating to the confessions, *voir dire* examinations prior to introduction of the statements showed that defendant's concern was directed to whether the statements were voluntary and made with knowledge of defendant's constitutional rights, the trial court found upon supporting evidence that the confessions were not impermissibly obtained, and defendant did not request the court to strike or to instruct the jury to disregard expressions in the confessions showing that defendant was an escaped prisoner; furthermore, the admission of such expressions was harmless in view of the detailed confessions by defendant and the testimony by the rape and kidnapping victim who also witnessed the murder and armed robbery.

13. **Criminal Law § 117— instructions — believing all or none of witness's testimony — omission of "or any part"**

Trial court's omission of the words "or any part" from its instruction that the jury "may believe all that a witness says or you may believe none" was a technical omission which could not have affected the result and did not entitle defendant to a new trial.

14. **Criminal Law § 111; Rape § 6— improper punctuation of instruction — no right to new trial**

. Although an instruction as shown in the record would appear to permit the jury to find defendant guilty of rape if defendant put the alleged victim in the back seat of a car by force and against her will .rather than requiring the sexual intercourse to be by force and .against her will, defendant is not entitled to a new trial where the insertion of commas before and after a phrase in the instruction makes the instruction completely accurate, since the court reporter's punctuation · of the judge's charge is not sufficient evidence of error to warrant a new trial.

**15. Rape § 6— failure to submit lesser offense**

The trial court in a rape case did not err in failing to submit to the jury the lesser included offenses of assault with intent to commit rape and assault on a female where all the evidence showed completion of the act of sexual intercourse after the victim was abducted, with threats to injure her if she made an outcry, and transported, with her hands tied behind her back, to a remote spot where the act of intercourse was committed, and that defendant had a knife at all times.

**16. Homicide § 30— failure to submit second degree murder**

The trial court in a prosecution for first degree murder did not err in failing to submit to the jury the question of defendant's guilt of second degree murder where all the evidence was to the effect that defendant stabbed and killed the victim for the purpose of stealing the automobile in which the victim was sitting and that the killing was with premeditation and deliberation.

**17. Constitutional Law § 36; Criminal Law § 135— mandatory death penalty for certain crimes — reaffirmation of decision**

The decision of *State v. Waddell*, 282 N.C. 431, holding that a defendant lawfully convicted of an offense of first degree murder, rape, first degree burglary or arson committed after 18 January 1973 must be sentenced to death, is reaffirmed. G.S. 14-17; G.S. 14-21; G.S. 14-52; G.S. 14-58.

**18. Criminal Law § 138— punishment — construction of State statute — decision of N. C. Supreme Court**

The determination of what statutes of this State mean with reference to the punishment to be imposed for criminal offenses is a question of State law and the determination thereof by the N. C. Supreme Court is authoritative.

**19. Constitutional Law § 2— construction of State Constitution — decision of N. C. Supreme Court**

The meaning of the State Constitution is a matter of State law upon which the decision of the N. C. Supreme Court is final.

**20. Constitutional Law § 36; Criminal Law § 135— death penalty — constitutionality — powers of solicitor, jury and Governor**

The death penalty is not unconstitutionally discretionary and arbitrary because (1) the solicitor has the power to prosecute for a lesser charge, (2) the jury has the power to acquit or to convict of a lesser charge and (3) the Governor has the power to commute the sentence or grant a pardon.

**21. Constitutional Law § 36; Criminal Law § 135— death penalty — constitutionality — number of death sentences**

The number of death sentences imposed since the decision of *State v. Waddell*, 282 N.C. 431, does not show that such decision was contrary to the intent of the Legislature.

State v. Jarrette

22. **Constitutional Law § 36; Criminal Law § 135— death penalty — constitutionality — number of death sentences**

　　The small number of death sentences imposed since the decision of *State v. Waddell*, 282 N.C. 431, does not show that the death penalty is imposed arbitrarily in this State.

23. **Constitutional Law § 36; Criminal Law § 135— death penalty — constitutionality — imposition on non-whites**

　　There is no merit in defendant's contention that the death penalty is unconstitutional on the ground that those sentenced to death since the decision of *State v. Waddell* are predominantly non-white.

24. **Constitutional Law § 36; Criminal Law § 135— death penalty — constitutionality — public opinion**

　　There is no merit in defendant's contention that the death penalty constitutes cruel and unusual punishment because public opinion has overwhelmingly repudiated it, it being clear that there is widespread opinion both in this State and the nation that the death penalty is the appropriate punishment for certain crimes.

25. **Constitutional Law § 36; Criminal Law § 135— death penalty — constitutionality — obtaining goals of punishment**

　　There is no merit in defendant's contention that the death penalty for rape and murder is unconstitutional on the ground that it is futile because it is not the most effective means for obtaining the goals of criminal punishment since the Legislature is not required to prescribe the most efficacious punishment for crime but it is sufficient that reasonable men can believe that the punishment prescribed is reasonably adapted to the attainment of the goals of all criminal punishment, and since the statutes prescribing the punishment for murder and rape meet this constitutional standard.

　　Chief Justice BOBBITT dissenting as to death sentences.

　　Justices HIGGINS and SHARP join in dissenting opinion.

　　Justice SHARP concurring further in dissenting opinion.

APPEAL by defendant from *McConnell, J.,* at the 18 June 1973 Criminal Session of UNION. This case was docketed and argued as No. 98 at the Fall Term 1973.

　　The defendant was found guilty of the rape of Gwendolyn Blackmon, a 16 year old Negro girl; the first degree murder of David Timothy Parker, a 16 year old white boy; the kidnapping of Gwendolyn Blackmon; and the armed robbery of David Timothy Parker. He was sentenced to death for the rape and for the murder and to imprisonment for life for the kidnapping. Prayer for judgment was continued on the charge of armed robbery, the State having relied upon this felony as an essential element of the murder in the first degree. The defendant appealed from all three of the judgments imposed, setting forth

State v. Jarrette

126 assignments of error, many of which were abandoned in his brief. Many others present the same question of law.

Prior to the selection of the jury, the defendant made certain pretrial motions, including a motion for change of venue. From exhibits offered by the defendant in support of this motion, it appears that on 9 February 1973 the defendant was serving a sentence of 23 to 28 years in Odom Prison for two murders by stabbing with a knife, a circumstance not disclosed by the evidence presented in the presence of the jury in the present cases. It further appears from these exhibits that he was permitted to leave the prison on that date to attend a state convention of the Junior Chamber of Commerce (Jaycees), he being an officer in the chapter of that organization established in Odom Prison. While at the convention, he eluded the guard who had accompanied him and escaped. Two days later, he was in Charlotte and engaged in the activities from which the present charges arise. Four days thereafter, he was arrested by agents of the Federal Bureau of Investigation in Memphis, Tennessee. Waiving extradition, he was returned to Union County for trial.

The defendant offered no evidence before the jury. That introduced by the State showed, in substance, the following:

At approximately 3:30 p.m. on Sunday, 11 February 1973, Gwendolyn Blackmon, a 16 year old Negro high school student, drove alone in her automobile to the Charlotte Public Library. As she was getting out of her car in the parking lot, a man, whom she had never seen before but whom she positively identified, in court, as the defendant, pushed her back into the car, telling her that if she screamed or did not "go along with what he said," he would kill her, tied her hands behind her back, showed her a "scout knife," compelled her to lie down on the seat, took her keys from her purse and drove off with her in the car, telling her he was a sex maniac.

Upon arriving at a location, subsequently pointed out by Gwendolyn Blackmon to the sheriff, on a dirt road in rural Union County, the defendant put the girl into the back seat of the car, disrobed her completely and, with the knife at hand, had sexual intercourse with her, following which he committed an unnatural sexual act upon her. When, prior to these acts, she begged him not to touch her, he replied that he "didn't like for people to beg him, so please stop begging." Following these acts,

he instructed her to get dressed and, when she did so, he retied her hands behind her back. They returned to the front seat of the car and the defendant drove to the town of Waxhaw. En route, he told her he wished she were white because, if she were, he would kill her, but "if he could find a way of getting another car," he would give her car back to her and let her go free.

Arriving at the launderette in Waxhaw, the defendant parked beside another car, a 1971 Pontiac Grand Prix, yellow with a cream vinyl top, in which a 16 year old white boy, David Timothy Parker, sat alone. The defendant, taking the keys to Gwendolyn Blackmon's car with him, and leaving her in her car with her hands still tied behind her back, walked over to the boy's car. The Parker boy rolled down his window and the defendant engaged him in a brief conversation. The defendant then pulled the knife from his pants and stabbed the boy twice. The boy tried to get out of the other side of his car but was unable to do so. The blood was gushing from his mouth and nose. The defendant shoved the dying boy over onto the passenger's side of the front seat, got in the car and drove away. He returned momentarily to untie Gwendolyn Blackmon's hands and give her back the keys to her car. Thereupon, she returned to her home in Charlotte and reported what had happened to her parents and to the police.

At about 5:00 p.m. that afternoon, David Timothy Parker had borrowed his brother's 1971 Pontiac Grand Prix, yellow with a white vinyl top, saying he was going to the launderette. On 13 February, his body was discovered in a roadside ditch, 5.4 miles from the Waxhaw launderette. The cause of his death was a deep stab wound in the left chest. The Parker automobile was discovered in Charlotte, the night of 11 February. Its interior was quite bloody. No one other than David Timothy Parker had the owner's permission to drive it.

At approximately 9:00 p.m. on 11 February, Charlotte Police Officers Griffin and Callahan, while patrolling in a police automobile, observed the Parker car parked beside a telephone booth and a man, identified, in court, by Officer Griffin as the defendant, standing in the booth. They turned into the parking lot. As they drew near the Parker automobile, the defendant drove away in it. The officers pursued him with their blue light flashing and horn blowing. They bumped the Parker car several times in unsuccessful efforts to stop it. Finally, the defendant slowed down, jumped from the car and fled on foot. He was

pursued by Officer Griffin but escaped by climbing over a fence which the officer was unable to climb. On the ground at that point, Officer Griffin found a coat containing a name plate bearing the defendant's name. The coat was identified by Gwendolyn Blackmon as the one worn by her assailant. A "hunting knife" was found in the glove compartment of the Parker automobile by the police officers. It was not there when the vehicle was lent by its owner to David Timothy Parker. It was identified by Gwendolyn Blackmon as the knife used by her assailant in her abduction and in the stabbing of David Timothy Parker.

On 15 February, F.B.I. Agents Phelps and Cooper located and arrested the defendant in Memphis, Tennessee, a warrant charging unlawful flight having been issued for his arrest. The defendant was then carrying in his pocket a kitchen knife with a six-inch serrated blade. Following a voir dire examination, duly conducted, the trial court found that the defendant had been given the full Miranda warning by these officers, had signed a written waiver of his right to counsel prior to interrogation by them, was then not under the influence of intoxicating beverages, was experienced in matters of police interrogation, was well versed in his constitutional rights, was not threatened or promised any reward and signed voluntarily a written statement, which statement was admitted into evidence. It was to the following effect:

While in Raleigh attending a Jaycee meeting, the defendant walked away. By "hitching" rides and traveling by bus, he arrived in Charlotte. There he saw a Negro girl getting out of her car near the library, "told her to shove over and not to holler" or he would hurt her, took her in her car out into the country and there "made love" to her after explaining that he did not want to hurt her. Then he drove on with the girl, in her car, to Waxhaw where they observed a white boy sitting in a car in the parking lot of a launderette. The defendant parked close to the other vehicle, got out, approached the boy, engaged him in a brief conversation, pulled out his knife, stabbed the boy, shoved him over to the passenger's side where he died in two or three minutes, and drove off with the boy's body in the car. After driving around fifteen or twenty minutes, he put the body in the ditch and proceeded back to Charlotte where he stopped at a telephone booth and called his mother in Louisiana. After leaving the telephone booth, he was observed and chased by police officers whom he evaded. He stole another car in

Mocksville and drove to Knoxville, Tennessee, where he took a bus to Memphis.

Thereafter, in an oral statement, also found by the court to have been made voluntarily, following the full Miranda warning, the defendant told these F.B.I. agents that after leaving Waxhaw with the body of the Parker boy in the car, he became stuck in a ditch due to snow; a motorist, passing by with his wife and several children, stopped and helped him to get out of the ditch; had the motorist observed the body of the Parker boy in the car, the defendant "would have had to kill the man and his family." He further stated to Agent Cooper that he felt no guilt at the murder of the young boy in Waxhaw, and that if he had the opportunity he would kill Agent Cooper.

On the evening of 11 February, Gwendolyn Blackmon gave to Sheriff Fowler of Union County a statement concerning the abduction, the rape, the murder and the theft of the Parker car which was essentially the same as her testimony in court, above summarized. She then accompanied Sheriff Fowler to and pointed out the place where the rape occurred and the launderette where the stabbing of the Parker boy occurred. At that time, she told the sheriff her assailant was "a black male, with a medium short bush, a mustache" and "a gold tooth with an emblem of a star in the center of it." The defendant has such a tooth.

Sheriff Fowler received the defendant from the federal officers in Memphis and returned him to North Carolina. After a voir dire, duly conducted, the court found as facts that the defendant was given the Miranda warning by the sheriff, signed a waiver of his right to counsel, was not under the influence of any intoxicating beverage or narcotic drug, was intelligent and well educated and that no promises or threats were made to him but that he freely and voluntarily and intelligently made a statement to Sheriff Fowler. Evidence on the voir dire examination supported these findings. The statement of the defendant to the sheriff was then admitted in evidence. It was to the following effect:

The defendant, a colored male born 4 October 1950, completed 12 grades in school. On 9 February 1973, he "escaped from Odom Prison." He went to Charlotte and on 11 February he saw "a small black girl" getting out of her car and told her to get back in. She "hollered" and he told her to shut up or he

would hurt her. She then got back in her car and he tied her hands behind her, told her to lie down in the car, which she did, and he drove away with her. After driving about 15 miles into the country, he told the girl he wanted her car and she could get out but she would not leave her car. He then drove onto a dirt road and parked and told the girl "if she made love" he would not hurt her. Thereupon, he had sexual relations with her. Driving on to Waxhaw, he observed a white boy sitting in a Grand Prix Pontiac car in front of a launderette. He told the girl he had to get another car, so he parked beside the Pontiac, went to the driver's side, told the boy he was having car trouble and asked the boy to help him. When the boy refused, the defendant pulled a "scout knife" from his belt and stabbed the boy twice, once in the upper chest and once in the shoulder. The boy was striking at the defendant when the defendant stabbed him. The wound in the chest killed the boy in two or three minutes. The defendant then told the girl to leave, which she did. Her name was Gwendolyn Blackmon. The defendant then got in the white boy's car and rode around for about 15 minutes before he became stuck in a ditch, from which a passing motorist pulled him. The defendant "was glad the people who pulled him out of the ditch didn't see the body" as he did not know what he might have done to them if they had done so. The defendant then put the body of the white boy in a ditch and drove on to Charlotte where he was chased by but eluded the police officers. Going on to Mocksville he stole another automobile which he drove to Knoxville, Tennessee. From there he took a bus to Memphis where he was arrested.

Attorney General Robert Morgan by Associate Attorney Maddox for the State.

Griffin and Humphries by James E. Griffin and Charles D. Humphries for defendant.

Adam Stein, Julius Levonne Chambers, Jack Greenberg, James M. Nabrit III, Jack Himmelstein, Peggy C. Davis and Anthony G. Amsterdam, attorneys for the NAACP Legal and Educational Fund, Inc., Amicus Curiae.

LAKE, Justice.

The principal thrust of the defendant's brief and the brief of the amicus curiae, in its entirety, are directed against the imposition of the death penalty for the crimes of first degree

murder and rape. The defendant's remaining 125 assignments of error are directed to various rulings of the trial court which he contends entitle him to a new trial on all of the charges.

We do not reach the question of the validity of the judgments imposing the death penalty for first degree murder and for rape if the defendant is entitled to a new trial on these charges for the reason that he did not receive a fair trial in accordance with law. Therefore, we turn first to those 125 other assignments of error. Fifty of these are expressly abandoned by the defendant in his brief. Many of the others present the same question of law. Others are purely formal. Due to the gravity of the offenses charged and the punishments imposed, we have carefully considered the entire record and each assignment of error, including those abandoned, to determine whether the defendant is entitled to a new trial on any or all of the charges against him.

[1] Over the objection of the defendant, the State's motion to consolidate for trial the four charges (murder, rape, kidnapping and armed robbery) was granted and the defendant's motion for severance was denied. In these rulings there was no error.

G.S. 15-152 provides:

"When there are several charges against any person for the same act or transaction or for two or more acts or transactions connected together, or for two or more transactions of the same class of crimes or offenses, which may be properly joined, instead of several indictments, the whole may be joined in one indictment in separate counts; and if two or more indictments are found in such cases, the court will order them to be consolidated * * *."

The uncontradicted evidence is that the entire series of events comprising the four crimes with which the defendant is charged began at about 3:30 p.m., Eastern Standard Time, on 11 February 1973 and was concluded when it was just dark enough to require lights on automobiles. On that date, this would be approximately two and one-half hours. Obviously, the four offenses constituted a continuing criminal episode. See: *State v. Frazier*, 280 N.C. 181, 185 S.E. 2d 652; *State v. Turner*, 268 N.C. 225, 150 S.E. 2d 406; *State v. White*, 256 N.C. 244, 123 S.E. 2d 483; *State v. Chapman*, 221 N.C. 157, 19 S.E. 2d 250. They were so related in time and circumstance as to permit the admission in evidence of each in the trial of the others. *State*

*v. Morrow,* 262 N.C. 592, 138 S.E. 2d 245; *State v. McClain,* 240 N.C. 171, 81 S.E. 2d 364; *State v. Harris,* 223 N.C. 697, 28 S.E. 2d 232; Stansbury, North Carolina Evidence (Brandis Revision), § 91. Under these circumstances, the consolidation of the cases for trial was within the sound discretion of the trial judge. *State v. Yoes* and *State v. Hale,* 271 N.C. 616, 157 S.E. 2d 386.

[2] There was no error in the denial of the defendant's motions, heard before trial and in the absence of prospective jurors, for removal of the cases to another county for trial and, upon denial of that, for the summoning of a special venire from a county other than Union. The ground stated for each motion was that, due to the publicity in the various news media concerning these offenses and the resulting charges against the defendant, it would not be possible for him to obtain a fair and impartial trial in Union County by a jury composed of its residents. In support of his motion, the defendant offered affidavits and copies of stories appearing in newspapers published in Union County and in Charlotte. The State offered, in opposition, a number of witnesses who expressed the opinion that the defendant could receive a fair and impartial trial in Union County by a jury composed of its residents.

The newspaper stories were not inflammatory in nature. All were well within the normal limits of newspaper reporting of criminal activity. Their substance was as follows: On 9 February 1973, the defendant was serving a term in the Odom State Prison for two murders. While in prison, he became president of a chapter of the Junior Chamber of Commerce (Jaycees), organized within the prison. On 9 February 1973, he was permitted by the prison officials to leave the prison to attend a Jaycee convention in Raleigh, accompanied by a guard. In abuse of the confidence thus placed in him, he eluded the guard at the convention and escaped. Two days later, these criminal offenses occurred and the victim of the kidnapping and rape identified the defendant as the perpetrator of all four of them.

These circumstances attracted the attention of all the news media of the State. The defendant offered no evidence that such publicity was more widespread in Union County than in any other county to which the case might have been removed in accordance with G.S. 1-84. To hold that the defendant could not be tried in a county in which newspapers, carrying stories of

the offenses and charges, circulated would preclude trial in any county of the State.

As the defendant concedes, these motions were directed to the discretion of the trial court. *State v. Blackmon,* 280 N.C. 42, 185 S.E. 2d 123; *State v. Yoes* and *State v. Hale, supra; State v. Porth,* 269 N.C. 329, 153 S.E. 2d 10; *State v. McKethan,* 269 N.C. 81, 152 S.E. 2d 341. There is no indication whatever of abuse of discretion in their denial in the present instance. See: *State v. Blackmon, supra; State v. Brinson,* 277 N.C. 286, 177 S.E. 2d 398; *State v. Conrad,* 275 N.C. 342, 168 S.E. 2d 39.

[3] We observe, though the defendant did not raise the point, that the kidnapping occurred in Mecklenburg County. Thus, Mecklenburg County was the proper venue for the trial of that charge. Venue, however, may be waived by a defendant and is waived by his going to trial without requesting transfer to the proper county. *State v. Ray,* 209 N.C. 772, 184 S.E. 836; Strong, N. C. Index 2d, Criminal Law, § 15. The motion for change of venue on the ground of local prejudice is not such a request. Consequently, placing the defendant on trial in Union County is not ground for a new trial on the charge of kidnapping in this instance.

[4] The defendant next moved, prior to trial, that prospective jurors be questioned separately, out of the presence of other selected or prospective jurors. The ground was that this would avoid possibility that a prospective juror, in response to a question, might refer, in the presence of other prospective or previously selected jurors, to what he had read or heard through the news media concerning the defendant's being an escaped prisoner. This motion also was directed to the sound discretion of the trial judge. *State v. Bryant,* 282 N.C. 92, 191 S.E. 2d 745; *State v. Perry,* 277 N.C. 174, 176 S.E. 2d 729. There was no abuse of discretion in its denial.

[5] Forty-four assignments of error relate to questions propounded by the Solicitor to the prospective jurors as to their views concerning the death penalty. No material difference in these questions is suggested by the defendant and we perceive none. Consequently, these assignments will be discussed together. It is to be observed that these assignments relate, not to the sustaining of a challenge by the State but merely to a propounding of a question to the prospective juror. Obviously, prospective jurors may be asked questions which will elicit information not,

per se, a ground for challenge in order that the party, propounding the question, may exercise intelligently his or its peremptory challenges. *Swain v. Alabama,* 380 U.S. 202, 219, 85 S.Ct. 824, 13 L.Ed. 2d 759; *State v. Allred,* 275 N.C. 554, 169 S.E. 2d 833; *State v. Atkinson,* 275 N.C. 288, 308, 167 S.E. 2d 241; G.S. 9-15.

The interrogations to which these assignments of error are directed are typified by the following question propounded to prospective juror, Mrs. McWhorter:

"Do you have any moral or religious scruples or beliefs against the imposition of the death penalty in certain cases?"

No challenge to a prospective juror was sustained upon an affirmative answer to this question alone. The defendant asserts that merely "to ask such a question violates the spirit of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed. 2d 776." We do not so construe either the letter or the spirit of the Witherspoon decision. We have held many times that there is no error in permitting questions to be propounded to prospective jurors concerning their views about the death penalty. *State v. Rogers,* 275 N.C. 411, 168 S.E. 2d 345; *State v. Yoes* and *State v. Hale, supra,* at p. 643; *State v. Spence,* 271 N.C. 23, 155 S.E. 2d 802. We consider below the effect of the Witherspoon decision upon rulings of the Superior Court sustaining challenges to prospective jurors following their responses to other questions propounded by the Solicitor.

[6]   The defendant assigns as error the court's sustaining of the Solicitor's challenges to prospective jurors Baucom, Haigler, Mosley, Mrs. McWhorter and Mrs. Purser, contending that the allowance of such challenges for cause violated "the spirit of Witherspoon." There was no material difference in the questions and answers upon the basis of which these five challenges for cause were sustained. Those here quoted, directed to and given by prospective juror Baucom, after he had stated that he did not believe in the imposition of the death penalty, are typical:

"Q. On account of that moral or religious scruple, or scruples would it be impossible under any circumstances and in any event for you to return a verdict of guilty of

State v. Jarrette

murder in the first degree and rape knowing at the time that the defendant would be sentenced to death?

"A. Yes, sir, I couldn't do it.

*     *     *

"Q. If you were chosen to sit on this jury, are you saying that you would not under any circumstances give any consideration to returning a verdict which would involve the death penalty?

"A. No, sir.

"Q. That is what you are saying?

"A. That is what I am saying, I couldn't do it."

The sustaining of the challenges for cause to these five prospective jurors, in view of their responses on voir dire, was not a violation of either the letter or the spirit of *Witherspoon v. Illinois, supra.* As the defendant concedes, these rulings were in accord with our decision in *State v. Sanders,* 276 N.C. 598, 174 S.E. 2d 487. They were also in accord with our similar rulings in *State v. Anderson,* 281 N.C. 261, 188 S.E. 2d 336; *State v. Watson,* 281 N.C. 221, 188 S.E. 2d 289; *State v. Frazier, supra; State v. Doss,* 279 N.C. 413, 183 S.E. 2d 671; *State v. Westbrook,* 279 N.C. 18, 181 S.E. 2d 572, and many other recent decisions.

[7] The defendant assigns as error the denial by the Superior Court of his motion for a mistrial due to a response by juror Larry McCoy to a question by the defendant before he was accepted as a juror. After Mr. McCoy had stated that he had heard about the case and probably had read it in the newspaper but had not seen it on television or heard it on radio, the interrogation proceeded as follows:

"Q. At the time you read about it did you form an opinion as to this man's innocence or guilt?

"A. Yes, sir.

"Q. Do you still have that opinion?

"A. No, sir.

"Q. What stage did you cease to have it?

"A. No answer.

"Q. You said you had formed an opinion as to his innocence or guilt but now you do not have it any longer. Did you just forget what you had read—

"A. Yes, sir. I didn't recall exactly what I had read now.

"Q. And you are saying that you cannot now recall what you read about this case?

"A. Not word for word. The main part that I remember was what stuck in my mine [sic], I believe he was declared an outlaw. Is that not true? That's the part that stuck in my mind."

"MR. GRIFFIN (counsel for defendant): I move for a mistrial, your Honor.

"COURT: MOTION DENIED. EXCEPTION.

"Q. Mr. McCoy, as you sit there now do you have an opinion as to this man's innocence or guilt?

"A. No, sir.

"Q. Could you take what you read as being evidence of his innocence or guilt?

"A. No, sir."

The defendant did not elect to challenge this juror for cause or peremptorily. He had not at that time exhausted his peremptory challenges. Mr. McCoy served on the jury.

This assignment of error is not directed to Mr. McCoy's service on the jury. It is directed to the denial of the defendant's motion for mistrial for his statement, in the presence of other prospective and selected jurors, that he remembered, he believed, having read that the defendant was declared an outlaw.

A mistrial is not lightly granted. The granting of the defendant's motion therefor rests largely in the discretion of the trial judge. *State v. Self,* 280 N.C. 665, 187 S.E. 2d 93; Strong, N. C. Index 2d, Criminal Law, § 128. We see no error in the denial of the motion in this instance.

[8] The court denied the defendant's challenge for cause to juror Frank Parker. The ground for challenge was that Mr.

Parker, a member of the special venire, drawn and summoned after the regular panel was exhausted, had seen a television news report about the case the night before he was called into the jury box. Nothing whatever in the record suggests the nature of the television newscast so heard, nor does it appear that Mr. Parker had been summoned for jury duty prior to listening to the newscast. The defendant interrogated Mr. Parker at considerable length and no information was developed indicating any prejudice against the defendant, any preconceived idea concerning his guilt or innocence, or other ground for challenge. After the conclusion of the defendant's interrogation of this juror, the court interrogated him as follows:

> "COURT: I'd like to ask him a question. In view of the fact you heard something on the television last night about the trial, and this is the time when the jury is being selected, no evidence has been presented, do you feel that you can sit and hear the evidence as it comes from the witness stand and give this defendant a fair and impartial trial without being influenced in any way by what you previously heard?
>
> "A. Yes, sir, I could.
>
> "COURT: Including what you heard last night on the television?
>
> "A. Yes, sir."

There was no error in denying the defendant's challenge for cause to this juror. *State v. Fox*, 277 N.C. 1, 175 S.E. 2d 561; *State v. DeGraffenreid*, 224 N.C. 517, 31 S.E. 2d 523.

Gwendolyn Blackmon, after testifying that the defendant, positively identified in court by her, kidnapped and raped her, testified that she saw him walk up to and stab, with his knife, a white boy sitting in a "1971 Grand Prix, yellow with a cream vinyl top," parked in the parking lot of a launderette (identified by her as the launderette in Waxhaw). She further testified that, as a result, blood gushed from the mouth and nose of the boy and the defendant got in the boy's car and, after shoving his body over into the passenger's seat, drove away. The boy so stabbed wore a cap similar in appearance to that found on the body of David Timothy Parker as it lay in a roadside ditch some five miles from the launderette.

The Parker boy's brother testified that he, himself, was the owner of such an automobile and had lent it that afternoon to

David Timothy Parker. This automobile was recovered that evening by police officers in Charlotte after the defendant, who was driving it, had fled from it. It was heavily blood stained, not having borne such stains at the time the owner lent it to David Timothy Parker. The cause of the Parker boy's death was a stab wound in the chest.

[9]  Over objection, the brother of David Timothy Parker was permitted to testify that, when he borrowed the car and immediately before driving off in it, David Timothy Parker said he was going to the launderette in Waxhaw. The ground of the defendant's objection was that this was hearsay evidence, which, of course, it is. It is, however, within an exception to the hearsay rule noted by us in *State v. Vestal,* 278 N.C. 561, 581-590, 180 S.E. 2d 755. It was also admissible as part of the *res gestae* of the borrowing and departure. Annot., 163 A.L.R. 15, 21. If it were not admissible under either of these exceptions to the hearsay rule, its admission would be, at most, harmless error. The only effect of the evidence would be to tend to identify David Timothy Parker as the boy whom the defendant stabbed. As above noted, the other evidence in the case established this fact beyond controversy. There is no merit in this assignment of error.

[10]  Officer Griffin of the Charlotte Police Department testified that on 11 February 1973 at approximately 9:00 p.m., he and another officer were patrolling in a police vehicle as a result of a call they had received. He observed the Parker automobile parked beside a telephone booth at a service station. In the booth was a Negro man. As they pulled into the parking lot for the purpose of questioning the man, he got in the car and drove off. They pursued him and at one point drew parallel with the other automobile on its left side. At that point the other car turned into the path of the police car and struck it, then speeding off.

Officer Griffin was seated in the passenger's seat of the police vehicle. Thus, he was immediately next to the driver of the other vehicle when the two cars were parallel and in collision. He testified that he had an opportunity to see the face of the driver of the other vehicle. The police officers continued the pursuit, bumping the Parker car several times in unsuccessful efforts to stop it. Finally, it slowed down and the driver jumped out and fled on foot. Officer Griffin pursued him on foot, drawing within ten feet of him. He unequivocally identified the de-

fendant in court as the man who was driving the Parker car. To this evidence, there was no objection.

On cross-examination, Officer Griffin testified that he saw the defendant at a distance of about ten feet for four to five seconds while pursuing him on foot. There were street lights in the area. He then testified: "My identification of that subject as being the defendant is not based on my observation of that driver for four to five seconds. I am basing my identification on pictures that I saw of the suspect. My identification is not based strictly on what I saw that night." Thereupon, the defendant's counsel moved to strike the officer's in-court identification of the defendant and the court conducted a voir dire examination of the officer.

On such voir dire, the officer testified that his identification of the defendant as the man he so pursued in Charlotte on the night of February 11, 1973 was based upon what he saw that night as he and his companion were chasing the car, that he saw photographs of the defendant later, but his in-court identification of the defendant as the man he so pursued was based "solely on my observation, seeing him in that car that night." He then described the appearance of the driver of the other vehicle as he saw him in the car and again identified the defendant as the man he then saw. Upon this evidence, the court overruled the motion to strike. In this ruling we find no error.

Although the trial judge should have made specific findings of fact following the voir dire, his overruling of the motion to strike, under the circumstances, necessarily implies the finding that the in-court identification by the witness was based on what the witness saw in the course of the pursuit of the other vehicle and its driver. The evidence is ample to support such finding. Furthermore, there is nothing whatever in the record concerning the nature of the pictures he saw later, or to indicate that these, or the circumstances under which he saw them, were impermissibly suggestive. The in-court identification had an independent origin. There is nothing to indicate a substantial likelihood of irreparable misidentification through the subsequent inspection of photographs. *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed. 2d 1247; *State v. Morris,* 279 N.C. 477, 183 S.E. 2d 634. Finally, as to this point, Officer Griffin's identification of the defendant, as the man he pursued, is corroborated by his finding of the defendant's coat on the ground at the point where the fleeing man jumped over

a fence and thus escaped. .It is further corroborated by the defendant's own statement to Sheriff Fowler, discussed below.

The next three assignments of error are directed to the admission of statements made by the defendant to the agents of the Federal Bureau of Investigation who arrested and interrogated him.

Agent Phelps of the Federal Bureau of Investigation, who arrested the defendant in Memphis, Tennessee, testified concerning both an oral statement and a written statement given by the defendant to the witness as the result of in-custody interrogation. Before admitting this evidence, the court conducted voir dire examinations and made full findings of fact. He found that, before such interrogation, the F.B.I. agents conducting the interrogation gave the defendant the full warning required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694. He further found that the defendant signed a written waiver of his constitutional rights, including his right to have an attorney present at the interrogation, and that the defendant made the statements, oral and written, freely, voluntarily and intelligently. These findings, being fully supported by the evidence on the voir dire examination, are conclusive on appeal. *State v. Fox, supra; State v. Gray*, 268 N.C. 69, 79, 150 S.E. 2d 1; *State v. Barnes*, 264 N.C. 517, 142 S.E. 2d 344; *State v. Rogers*, 233 N.C. 390, 64 S.E. 2d 572. An in-custody confession is competent if made voluntarily after the defendant has been given proper warning of his constitutional rights and has full knowledge thereof. *State v. Chance*, 279 N.C. 643, 661, 185 S.E. 2d 227; *State v. Murry*, 277 N.C. 197, 176 S.E. 2d 738; *State v. Gray, supra.*

The defendant does not contend that the statements were not voluntary or that they were made without full knowledge of his constitutional rights. His contention is that it was error to permit Agent Phelps to read to the jury the written confession, consisting of five pages of detailed account of the defendant's activities from the abduction of Gwendolyn Blackmon to the arrest of the defendant in Memphis, because it includes the defendant's statement, "[W]hile I was attending a J.C. Day in the General Assembly in Raleigh, North Carolina, at the Hilton Inn, I walked away." It is his contention that this "shows escape and previous convictions," evidence of which would not be admissible.

As a matter of fact, the written confession also states that the defendant telephoned his mother in Louisiana and told her he had "escaped from prison" and that he told the woman, in whose house he was arrested in Memphis, that he "had just got out of prison."

Agent Phelps also testified that, in his oral statement, the defendant "told us that on February 9, 1973 that while he was in Raleigh attending a Jaycee meeting he walked away from the guards that were there." The defendant's contention on appeal is that this is also inadmissible evidence of his having committed some prior criminal offense. (At no time was there any evidence before the jury as to the nature of the prior offenses.)

[11] Finally, in this connection, the defendant assigns as error the denial of his motion for a mistrial for the reason that Agent Phelps testified, "We asked Mr. Jarrette if he would relate to us details surrounding the time of his escape until the time [of his arrest in Memphis]." Again, the contention of the defendant is that such testimony was inadmissible evidence to the effect that the defendant had committed previously some criminal offense. The circumstances of this ruling are disclosed by the record to have been as follows:

After the court had conducted the voir dire examination concerning the defendant's oral statement to the F.B.I. agents, and had ruled evidence thereof admissible, the jury returned to the courtroom and Agent Phelps resumed his testimony. The record shows the following took place:

"Q. Thereafter, after the defendant placed his signature at or near the bottom of State's Exhibit 18 [the signed waiver of his constitutional rights], Mr. Phelps, what, if any, statement *did he make to you?* [Emphasis added.]

"OBJECTION. OVERRULED.

"Q. Go ahead.

"A. At that time *we asked* Mr. Jarrette if he would relate to us details surrounding the time of his escape until the time—[Emphasis added.]

"OBJECTION.

"COURT: If he would relate to you what?

"A. If he would relate to us the events that evolved from the time he had escaped until the time he was arrested.

---

---

"MR. GRIFFIN [defendant's counsel] : Move that that portion 'escaped' be stricken.

"COURT: You will not consider his statement as to 'escaped.'

"Q. Mr. Phelps, my question is what, if any, statement did he make, not what you said.

"MR. GRIFFIN: I'd like to get—

"COURT: You will not consider any statement that Officer Phelps made asking the defendant to relate the events subsequent to an escape.

"MR. GRIFFIN: I would like the record to show that I made a motion to a mistrial at this time.

"COURT: MOTION DENIED. EXCEPTION."

It is, of course, the general rule that upon the trial of a criminal charge, the defendant not having taken the stand as a witness, evidence of his bad character is not competent and, for this reason, the State may not introduce evidence showing that he committed an unrelated criminal offense. *State v. McClain, supra;* Stansbury, North Carolina Evidence (Brandis Revision), § 91. However, Agent Phelps' statement inferring that the defendant had escaped from prison was not responsive to the question propounded to him by the Solicitor. Immediately, upon motion of the defendant's counsel, the court properly instructed the jury not to consider this statement. We find in this circumstance no ground for a mistrial. *State v. Self, supra.*

[12] Thereupon, Agent Phelps, in response to the Solicitor's question, related to the jury the detailed, oral statement of the defendant to him, including the words, "[W]hile he was in Raleigh attending a Jaycee meeting he walked away from the guards that were there." At the conclusion of the witness' answer, the defendant made a motion to strike the entire answer, but not a motion to strike the statement that the defendant had walked away from the guards.

Again, when the defendant's written confession was introduced in evidence, there was a general objection only and, after it was read, a general motion to strike the entire answer. The court was not requested to strike or to instruct the jury to disregard the expressions therein that, while attending the Jaycee

meeting in Raleigh the defendant "walked away," that he telephoned his mother and told her he had "escaped from prison" and had told the woman, in whose home he was arrested in Memphis, that he "had just got out of prison."

The earlier ruling by the court, concerning Agent Phelps' non-responsive use of the word "escape," shows clearly that, had the defendant requested him to do so, the judge would have stricken from the written confession the above quoted words contained therein. Nothing in the record indicates that these particular expressions in the written document were called to the court's attention. The objection was to the introduction of the document in its entirety and the evidence on the voir dire examinations, conducted with reference both to the oral and to the written statements of the defendant to the officers, gave the court to understand that the defendant's objections were to the statements in their entirety and on the ground that they were impermissibly obtained, not to any specific words therein. "When testimony or a document is inadmissible only in part, the objection should specify the objectionable part; and if it is not so confined, it is not error to overrule it." Stansbury, North Carolina Evidence (Brandis Revision), § 27. In *Nance v. Telegraph Co.,* 177 N.C. 313, 98 S.E. 838, this Court said, "[W]here a part of testimony is competent, although the other part of it may not be, and exception is taken to all of it, it will not be sustained. * * * We will not set off the bad for him and consider only that much of it, upon the supposition that his objection was aimed solely at the incompetent part."

It will be observed that in these three assignments of error the defendant is not asserting that his constitutional rights have been denied or violated. He does not contend that the statements by him to the interrogating officers were involuntary, or that they were made without full knowledge of his constitutional rights. His contention is simply that, in these instances, evidence tending to show that he had previously committed some undesignated criminal offense was improperly placed before the jury. Under the circumstances, these assignments are without merit.

As the Supreme Court of the United States said in *Bruton v. United States,* 391 U.S. 123, 135, 88 S.Ct. 1620, 20 L.Ed. 2d 476, "Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every

---

---

trial where inadmissible evidence creeps in, usually inadvertently. 'A defendant is entitled to a fair trial but not a perfect one.' *Lutwak v. United States,* 344 U.S. 604, 619, 73 S.Ct. 481, 97 L.Ed. 593."

In *Schneble v. Florida,* 405 U.S. 427, 432, 92 S.Ct. 1056, 31 L.Ed. 2d 340, the Court, after referring to the above statement in the Bruton case, supra, said:

> "Thus, unless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is not required. * * * In this case, we conclude that the 'minds of an average jury' would not have found the State's case significantly less persuasive had the testimony as to Snell's admission been excluded. The admission into evidence of these statements, therefore, was at most harmless error."

In view of the detailed confession by the defendant and the testimony of Gwendolyn Blackmon, it is inconceivable that had the jury never heard these objectionable statements relating to the defendant's being an escaped prisoner, they would have rendered verdicts other than those which they did return.

Sheriff Fowler testified that after he returned the defendant to Union County, he also warned the defendant of his constitutional rights, in compliance with *Miranda v. Arizona, supra,* and the defendant signed another written waiver thereof, including his right to have counsel present at the interrogation. Thereafter, the defendant made an oral statement which the Sheriff reduced to writing but the defendant did not sign. Upon objection being interposed, the court conducted another full voir dire examination and thereafter made full findings of fact, fully supported by the evidence on the voir dire examination, to the effect that such statement was made voluntarily and intelligently, after the giving of the requisite warning concerning his constitutional rights. The court then overruled the objection to the testimony of the Sheriff concerning such statement. The Sheriff thereupon related to the jury the statement so given him by the defendant which included the following:

> "I, Henry Jarrette, escaped from Odom Prison February 9, 1973. I, Jarrette, was at the Jaycee Day in the General Assembly in Raleigh. I, Jarrette, escaped because of the prison conditions. After I escaped, I, Jarrette, went to Charlotte * * * ."

Here, again, the objection was general and the defendant's motion to strike was directed to the entire statement. The lengthy voir dire examination of Sheriff Fowler, prior to the introduction of this testimony, clearly indicates that the defendant's concern was directed to whether the statement was voluntary and made with knowledge of the defendant's constitutional rights. For the reasons above mentioned, this assignment of error also is without merit.

The court, in its charge to the jury, said:

"You may believe all that a witness says or you may believe none. You are to weigh the evidence and find where the truth lies. * * * ."

[13]  The defendant assigns this as error, saying the court should have charged, "You may believe all, *or any part,* or none of what a witness says." (Emphasis added.) While the instruction suggested by the defendant would have been correct, and an improvement upon that actually given, we do not think the jury was misled by the omission of the words "or any part." This was a technical omission, not substantial, and could not have affected the result. Consequently, the defendant is not entitled to a new trial on account of it. *State v. Ingland,* 278 N.C. 42, 178 S.E. 2d 577; *State v. Lee,* 277 N.C. 205, 176 S.E. 2d 765; *State v. Gatling,* 275 N.C. 625, 170 S.E. 2d 593. At the conclusion of its entire charge, the court asked counsel if any further instructions were requested. Both the Solicitor and counsel for the defendant replied in the negative.

[14]  The record shows that the court, in its charge to the jury, said:

"If the State has satisfied you from the evidence and beyond a reasonable doubt that on or about the 11th day of February, 1973, the defendant, after tying the hands of Gwendolyn Blackmon, carrying her from Charlotte into Union County, and showing her a hunting knife, that he took off her clothes and had sexual relations with her in the back seat of the car after placing her in the back seat by the use of force and without her consent and against her will, he would be guilty of rape."

The defendant assigns this as error, contending that under this instruction the jury might have found the defendant guilty of rape if the defendant put the girl in the back seat of the car

by the use of force and without her consent and against her will, even though the act of intercourse was not with force and was with her consent. It will be observed that the insertion of commas before and after the phrase "after placing her in the back seat" makes the charge, on this point, completely accurate. The court reporter's punctuation of the judge's charge, standing alone, is not sufficient evidence of error to warrant a new trial. In the immediately preceding paragraph of the charge, the judge fully and accurately defined the crime of rape. It is not conceivable that the jury was misled by the above quoted portion of the charge.

[15] The defendant assigns as error the failure of the trial court to charge the jury that the defendant might be found guilty of assault with intent to commit rape or of assault on a female. There is no merit in this contention. These are lesser offenses included in the offense of rape. However, it is not necessary for the court to submit to the jury a lesser, included offense, or to instruct the jury thereon, where there is no evidence tending to show the defendant may be guilty of such lesser offense. *State v. Carnes,* 279 N.C. 549, 184 S.E. 2d 235; *State v. Murry, supra;* Strong, N. C. Index 2d, Criminal Law, § 115.

All of the evidence, including the statements given by the defendant to the arresting officers in Memphis and to Sheriff Fowler, shows completion of the act of sexual intercourse after the girl was abducted, with threats to injure her if she made an outcry, and transported, with her hands tied behind her back, to a lonely spot on a rural road where the act of intercourse was committed. The girl's testimony was that at all times the defendant exhibited to her, or had at hand, the knife with which he subsequently stabbed the Parker boy to death. The defendant's own statements were to the effect that he told her that *if she submitted,* he would not hurt her. There is no evidence whatever that she yielded except through fear of serious injury. Under these circumstances, it was not error to fail to charge the jury concerning the lesser included offenses and to instruct them that on the charge of rape they might return a verdict of guilty of rape or a verdict of not guilty. *State v. Bryant,* 280 N.C. 551, 556, 187 S.E. 2d 111; *State v. Carnes, supra;* Strong, N. C. Index 2d, Criminal Law, § 115.

[16] There was likewise no error in the court's failure to submit to the jury the question of the defendant's guilt of second

degree. murder, and to instruct the jury thereon. All of the evidence, including the statements by the defendant to the arresting officers and to Sheriff Fowler, is to the effect that the defendant stabbed and killed David Timothy Parker for the purpose of stealing the automobile in which the Parker boy sat and in the accomplishment of that purpose. The larceny of the automobile under these circumstances was robbery. G.S. 14-87; *State v. Bailey,* 278 N.C. 80, 178 S.E. 2d 809. A murder committed in the perpetration of a robbery is murder in the first degree. G.S. 14-17. *State v. Rich,* 277 N.C. 333, 177 S.E. 2d 422. The evidence, furthermore, shows clearly that the killing of the Parker boy was with premeditation and deliberation. There being no evidence whatever of a lesser degree of homicide, it was not error for the court to fail to instruct the jury concerning the lesser degrees of homicide and to instruct them that, on the charge of murder, they might return a verdict of guilty of murder in the first degree or a verdict of not guilty.

The defendant's remaining assignments of error, relating to the denial of his motions for nonsuit as to each of the charges, to instructions of the court to the jury and to rulings and procedures prior to the entry of the judgments, have all been carefully examined, whether abandoned by the defendant in his brief or not. There is no merit whatever in any of them. It would serve no useful purpose to discuss them individually. The verdicts of guilty of kidnapping, rape, murder in the first degree and armed robbery are each fully supported by the evidence. The record shows that the defendant received, on each charge, a fair trial in accordance with the law of this State. The record discloses no basis for disturbing any of the verdicts or the granting of a new trial upon any of the four charges.

We are thus brought to the defendant's principal contention, the sole contention of the amicus curiae, that even though the defendant received a fair trial, free from error, and, consequently, stands properly convicted of murder in the first degree and of rape, it was error to enter judgments on these charges sentencing him to death, and so, in Case No. 73CR1342 (murder) and Case No. 73CR1339 (rape), the judgments entered should be vacated and the cases remanded for judgments sentencing the defendant to imprisonment for life.

It will be noted that this assignment of error has no relation to the judgment imposing a sentence to imprisonment for life in

Case No. 73CR2843 (kidnapping). It will also be noted that in Case No. 73CR1341 (armed robbery) prayer for judgment was continued, this offense having been used by the State as an element of the crime of murder in the first degree.

In *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed. 2d 346, the Supreme Court of the United States held that the Eighth and Fourteenth Amendments to the Constitution of the United States forbid a state to inflict the penalty of death if, under the law of the state, either the jury or the judge is permitted, as a matter of discretion, to choose between the imposition of the death penalty and the imposition of the penalty of imprisonment. Each of the nine Justices, five concurring in the decision and four dissenting therefrom, wrote a separate opinion. The five Justices concurring in the decision did not agree, among themselves, as to the basis upon which the decision rests.

It is neither the function nor the purpose of this Court to defend or justify Furman, the stated reasons for it or the results which have flowed from it. Our function and intent has been, and is, to comply with it and to determine its effect upon the statutes of North Carolina, which expressly provide what penalty is to be imposed upon a defendant lawfully convicted of first degree murder, rape, first degree burglary or arson. G.S. 14-17, G.S. 14-21, G.S. 14-52, and G.S. 14-58.

Pursuant to Furman, we have received from the Supreme Court of the United States, and have complied with, mandates to vacate sentences of death affirmed by us prior to that decision. *State v. Frazier*, 283 N.C. 99, 195 S.E. 2d 33; *State v. Miller*, 281 N.C. 740, 190 S.E. 2d 841; *State v. Hamby and Chandler*, 281 N.C. 743, 191 S.E. 2d 66; *State v. Chance, supra; State v. Westbrook, supra; State v. Doss*, 281 N.C. 751, 191 S.E. 2d 70. In other cases, reaching this Court after the decision in Furman, involving offenses committed prior to our decision in *State v. Waddell*, 282 N.C. 431, 194 S.E. 2d 19, we have, in conformity thereto, vacated death sentences, and, having found no error in the trial, remanded the matters to the Superior Court for the imposition of sentences to life imprisonment. *State v. Blackmon*, 284 N.C. 1, 199 S.E. 2d 431; *State v. Watkins*, 283 N.C. 504, 196 S.E. 2d 750; *State v. Waddell, supra; State v. Carroll*, 282 N.C. 326, 193 S.E. 2d 85. See also: *State v. Gurley*, 283 N.C. 541, 196 S.E. 2d 725; *State v. Washington*, 283 N.C.

175, 195 S.E. 2d 534; *State v. Talbert,* 282 N.C. 718, 194 S.E. 2d 822.

Prior to 1949, the imposition of a sentence to death was mandatory, in this State, upon a conviction of first degree murder or rape. In 1949, the Legislature inserted a proviso in the statutes relating to the punishment of first degree murder and rape, similar provisions having been inserted earlier into the statutes relating to first degree burglary and arson. As so amended, G.S. 14-17 (relating to murder), at the time of Furman read:

> "A murder * * * which shall be committed in the perpetration or attempt to perpetrate any * * * robbery * * * shall be deemed to be murder in the first degree and shall be punished with death: Provided, if at the time of rendering its verdict in open court, the jury shall so recommend, the punishment shall be imprisonment for life in the State's prison, and the court shall so instruct the jury."

G.S. 14-21 (relating to rape), as so amended, was to the same effect, so far as punishment is concerned.

At the time *Furman v. Georgia, supra,* was decided, this Court had held in numerous decisions that the effect of the proviso, inserted into these statutes by the 1949 amendment, and the effect of the like provisos previously inserted in G.S. 14-52 (burglary) and G.S. 14-58 (arson), was to confer upon the jury in each case the absolute, "unbridled" discretion to fix the punishment at either death or imprisonment for life. *State v. Manning,* 251 N.C. 1, 110 S.E. 2d 474; *State v. Denny,* 249 N.C. 113, 105 S.E. 2d 446; *State v. Conner,* 241 N.C. 468, 85 S.E. 2d 584; *State v. Simmons,* 234 N.C. 290, 66 S.E. 2d 897; *State v. McMillan,* 233 N.C. 630, 65 S.E. 2d 212; *State v. Shackleford,* 232 N.C. 299, 59 S.E. 2d 825; *State v. Mathis,* 230 N.C. 508, 53 S.E. 2d 666. This, Furman held, the State may not do by reason of the Eighth and Fourteenth Amendments to the Constitution of the United States.

The question was therefore presented, as a result of *Furman v. Georgia, supra.* What part of G.S. 14-17 (murder) and what part of G.S. 14-21 (rape), if any, remains the law of North Carolina? That question came before this Court and was determined by us in *State v. Waddell, supra.*

While the decision in *State v. Waddell, supra,* was not unanimous, no member of this Court took the view that Furman invalidated G.S. 14-17 or G.S. 14-21 in its entirety. All of the members of this Court agreed that, notwithstanding Furman, these statutes remain in the law of North Carolina, in part, and only in part. The difference of opinion among the members of this Court was as to which part of each such statute remained the law of this State, the original provision making death the mandatory punishment, or the proviso, added by the 1949 amendment, which attempted to confer upon the jury the discretion forbidden by Furman. It was the view of the majority of this Court that the portion of each of these statutes which survived Furman, and remained the law of North Carolina, was the original provision making the death penalty mandatory and *State v. Waddell, supra,* so decided. The Supreme Court of Delaware reached the same conclusion as to the effect of *Furman v. Georgia, supra,* upon the similar statutes of that State. *State v. Dickerson* (Del.), 298 A. 2d 761.

To avoid another, and different, serious question of constitutional validity, should we give *State v. Waddell, supra,* retroactive effect, we there held that our decision would not be retroactive and that, consequently, the death penalty would be imposed only in cases where the offense was committed after the date of that decision (18 January 1973). To the same effect, see *State v. Dickerson, supra.*

[17] The reasons for our decision in *State v. Waddell, supra,* are fully set forth in the opinions therein and need not be recounted here. Having given full consideration to the brief and oral argument of the defendant and to the brief of the amicus curiae, requesting us to reconsider *State v. Waddell, supra,* we now reaffirm that decision and hold that the meaning of G.S. 14-17, G.S. 14-21, G.S. 14-52, and G.S. 14-58, in the light of the decision of the Supreme Court of the United States in *Furman v. Georgia, supra,* is that a defendant, lawfully convicted of first degree murder, rape, first degree burglary or arson, the offense having been committed after 18 January 1973, must be sentenced to death, the trial judge having no discretion in the matter of the sentence to be imposed and the jury having no authority to fix a different punishment.

[18] The determination of what the statutes of this State mean, with reference to the punishment to be imposed for criminal

offenses, is a question of State law and the determination thereof by this Court is authoritative. It is not a Federal question. *Adderly v. Florida,* 385 U.S. 39, 46, 87 S.Ct. 242, 17 L.Ed. 2d 149, reh. den., 385 U.S. 1020, 87 S.Ct. 698, 17 L.Ed. 2d 559; *Shuttlesworth v. Birmingham,* 382 U.S. 87, 86 S.Ct. 211, 15 L.Ed. 2d 176.

Having determined that the defendant has been lawfully and fairly convicted of first degree murder and of rape and having determined that G.S. 14-17 and G.S. 14-21 require a defendant so convicted to be sentenced to death, the question then becomes whether the imposition of such sentence in this case violates any provision of the Constitution of North Carolina or of the Constitution of the United States.

[19] The Constitution of North Carolina, Article XI, §§ 1 and 2, expressly permits the imposition of the death penalty upon conviction of first degree murder or upon the conviction of rape. The meaning of the State Constitution is also a matter of State law upon which the decision of this Court is final.

The contention of the defendant, and of the amicus curiae, is that a State statute, which makes it mandatory that a defendant, fairly and lawfully convicted of first degree murder or of rape, be sentenced to death, violates the Eighth and Fourteenth Amendments to the Constitution of the United States.

*Furman v. Georgia, supra,* does not so hold, only two of the nine Justices (Mr. Justice Brennan and Mr. Justice Marshall) indicating such a view in their opinions in that case. No other decision of the Supreme Court of the United States so holds. This is, of course, a Federal question and our determination of it is subject to review by the Supreme Court of the United States, but we must make the initial determination and must do so in the light of decisions heretofore rendered by that Court.

The arguments of the defendant and of the amicus curiae, in support of their position on this question, may be summarized as follows: (1) Although G.S. 14-17 (murder) and G.S. 14-21 (rape), as construed in *State v. Waddell, supra,* make the imposition of the death sentence mandatory upon conviction of first degree murder or rape, the death penalty is nevertheless discretionary and selective because (a) the Solicitor has the power to prosecute for a lesser charge, (b) the jury has the power to acquit or to convict of a lesser charge, and (c) the

Governor has the power to commute the sentence or grant a pardon; (2) since our decision in *State v. Waddell, supra*, the death sentence has been imposed in North Carolina more frequently than was the case prior to the decision in *Furman v. Georgia, supra*, from which it is concluded that our construction of these statutes is contrary to the legislative intent; (3) nevertheless, since *State v. Waddell, supra*, was decided, the death penalty has been imposed in such a small number of cases that its imposition is clearly selective and arbitrary; (4) the defendants sentenced to death since *State v. Waddell, supra*, was decided are predominantly non-white; (5) death is a cruel and unusual punishment because an "enlightened" public opinion has overwhelmingly repudiated it; (6) the punishment of death is both cruel and futile.

Although the mere statement of these contentions, in clear and simple terms, seems sufficient to show their lack of substance, the seriousness with which they are advanced impels us to take note of each of them briefly.

### (1) The Death Penalty Is Discretionary And Selective.

[20] As is true of any other criminal charge, a murder case or a rape case begins with someone notifying police officers that the offense has occurred. As the result of ensuing police investigation, the person charged is arrested and, in due time, the matter comes to the attention of the Solicitor. It is his duty to evaluate the information and determine whether to seek an indictment and, if so, for what offense. It is not the Solicitor's duty to seek the indictment or the conviction of the innocent, or to seek the conviction of a person, guilty of one crime, upon another and more serious charge of which he is not guilty. It is elementary and fundamental that a defendant is not to be convicted unless his guilt is established beyond a reasonable doubt. The decision of the Solicitor as to the offense for which he will seek an indictment from the grand jury and his decision as to whether to accept, with the permission of the court, a plea to a lesser charge, included within the offense specified in the indictment returned, are the results of an evaluation of the available evidence, including its credibility. The Solicitor's decision to charge a defendant with a crime, punishable by death if he is convicted, is a solemn one, properly reached only when, in the Solicitor's judgment, the evidence of guilt is clear and convincing. This is a human evaluation. There is often room

for difference of opinion concerning it. To say, as does the brief of the amicus curiae, that because the Solicitor determines in many cases that he should seek a conviction of a lesser offense, his decisions to seek convictions on capital charges in other cases are "freakish" is a patent absurdity, unjust to the skilled and honorable attorneys who hold and have held the high office of Solicitor in this State.

The purpose of vesting the power of judgment in an official is to enable him to make different decisions in different cases in the light of what he determines to be materially different factual situations. All governmental actions are based on this delegation of responsibility. The Fourteenth Amendment to the Constitution of the United States does not require a state, in the enforcement of its criminal laws, so to hedge its prosecuting attorney about with "guidelines" that he becomes a mere automaton, acting on the impulse of a computer and treating all persons accused of criminal conduct exactly alike. From the foundation of the country to the present date, the discretion, now complained of by the amicus curiae, has been vested in prosecuting officers throughout the country. Without it, the greatest injustices would necessarily be inflicted upon innocent persons accused of crime.

The suggestion by the amicus curiae that the death penalty is unconstitutional because in many cases, in which the prosecuting attorney seeks the death penalty, the jury acquits the defendant altogether or convicts him of a lesser, included offense, has, if possible, even less plausibility. Article I, § 24, of the Constitution of North Carolina requires a trial by jury in all such cases. The Sixth Amendment to the Constitution of the United States contains a like provision. Obviously, the possibility of different verdicts by different juries in different cases upon different evidence was not believed by the framers of these constitutional provisions to be a sound reason for denying a state the power to impose an otherwise lawful penalty upon one found guilty by the jury which tried him, he having had a fair trial in accordance with the applicable law. *State v. Yoes* and *State v. Hale, supra,* at p. 631.

It is quite true that Article III, § 5(6), of the Constitution of North Carolina gives to the Governor of this State the authority to commute a death sentence imposed upon any defendant, or to grant to such defendant an absolute pardon, and to refuse to disturb such sentence imposed upon a different de-

fendant. Article II, § 2, of the Constitution of the United States confers a like power upon the President. So far as we have been able to determine, a like power is vested in the Governor, or some other official of the Executive Department, in each of our states. This power has existed and has been exercised repeatedly by the Governors of every state and by the President of the United States from the birth of our country. If its existence and frequent exercise makes the imposition of the death penalty unconstitutional per se, the nine Justices of the Supreme Court of the United States wasted a great deal of thought and much paper in *Furman v. Georgia, supra*. None of them so suggested in that case.

We reject categorically the contention of the amicus curiae that "the inevitable result of the North Carolina system of commutation is that an arbitrarily selected number of those convicted of like crimes will be put to death." The Governor exercises his judgment after investigation of the record of the trial and other circumstances, including subsequently discovered evidence. This Court reviews the rulings of the trial judge. The Governor reviews the decision of the jury, which we may not do. The exercise by one Governor of this judgment, resulting in the commutation of the sentence of one man convicted of murder or rape and the refusal to commute the sentence of another convicted of such crime, cannot be called "freakish" or "arbitrary" merely because another Governor might, theoretically, have reached opposite conclusions.

The Equal Protection Clause of the Fourteenth Amendment makes no distinction between sentences to death and sentences to imprisonment. The Due Process Clause of that amendment protects liberty as well as life. The discretion in the Solicitor, in the jury and in the Governor, of which the amicus curiae complains, extends also to non-capital cases. If the existence of these discretionary powers makes the imposition of the death penalty unconstitutional, it would also make unconstitutional all prison terms, however long or short. Quite obviously, this is not the kind of discretion which the Supreme Court of the United States held impermissible in *Furman v. Georgia, supra*.

(2) *The Number Of Death Sentences Imposed Since State v. Waddell, Supra, Shows That Decision Was Contrary To The Intent Of The Legislature.*

[21]   This argument has no relation to the constitutionality of the death penalty. Our decision in *State v. Waddell, supra,* was announced 18 January 1973. It was well publicized. Bills were promptly introduced in the 1973 Session of the Legislature to counteract it and to abolish the death penalty. Obviously, this was within the authority of the Legislature. North Carolina Constitution, Article XI, § 2. Those bills failed to pass. This is a clearer indication of the intent of the Legislature than is a statistical comparison of death sentences imposed per year prior to *Furman v. Georgia, supra,* and subsequent to *State v. Waddell, supra.*

It is but natural that more death sentences per year will be imposed under a mandatory statute than under one giving the jury discretion as to the penalty. While the 1973 Session of the Legislature did not have before it statistics now available, it could hardly have supposed that the number of death sentences would not increase, at least until the fact that the death penalty is the lawful punishment in North Carolina for first degree murder, rape, first degree burglary and arson becomes known to those inclined to commit such offenses.

It is also perfectly obvious that it was the hope of the 1949 Session of the Legislature to reduce the number of death sentences imposed for murder and rape. Unfortunately, the statutory device which it adopted to effectuate such intent was held by the Supreme Court of the United States to be beyond the power of the Legislature. *Furman v. Georgia, supra.* By that determination, we are bound.

(3)   *The Small Number Of Death Sentences Imposed Since State v. Waddell, Supra, Shows The Death Penalty Is Imposed Arbitrarily.*

[22]   Having first contended that too many have been sentenced to death since *State v. Waddell, supra,* the amicus curiae here contends that the number is too small. *State v. Waddell, supra,* held the death penalty could be imposed under G.S. 14-17 (murder), G.S. 14-21 (rape), G.S. 14-52 (first degree burglary), or G.S. 14-58 (arson) only for offenses committed after 18 January 1973. There is, unavoidably, some time lag between the commission of an offense and the trial and sentencing of the offender.

As of 14 January 1974, virtually one complete year since our decision in *State v. Waddell, supra,* twenty-one persons,

including the present appellant, have been sentenced to death in North Carolina for crimes committed after the decision was announced, three being co-defendants charged with the rape of the same victim. The present appellant was the first person so to be sentenced and his is the first appeal from those so sentenced to reach this Court. It has, therefore, not yet been finally determined whether any or all of the remainder were tried and sentenced pursuant to law. Of all the twenty-one, thirteen were convicted of first degree murder only, one (the defendant) was convicted of first degree murder and of rape, five were convicted of rape only, one of first degree burglary only and one of first degree burglary and of rape.

We are not advised by the defendant or by the brief of the amicus curiae as to how many individuals were brought to trial in North Carolina during this twelve-month period on capital charges and no statistics on that matter are available to us. Consequently, we do not have before us the number acquitted or the number convicted of lesser, included offenses. If we had such statistical data, it would neither establish nor disprove the contention that the twenty-one sentenced to death were arbitrarily selected. Arbitrary discrimination cannot be shown from statistical data. It requires, at least, careful study of the records in cases where different results were reached in order to determine whether those differences in result were justified by differences in the facts. What we do know is that all defendants *convicted* of first degree murder or of ˙rape, committed since 18 January 1973, have been sentenced to death. The contention of arbitrariness is, therefore, not established.

(4) *Those Sentenced To Death Since State v. Waddell, Supra, Are Predominantly Non-White.*

[23]　The present record is completely silent as to the racial composition of the grand jury which indicted this defendant and the petit jury which found him guilty. We are quite certain that had there been no members of the defendant's race thereon, or had there been the slightest suggestion otherwise of racial discrimination in the selection of either the grand jury or the petit jury, the defendant and the amicus curiae would not have left us in ignorance thereof. We do know from our own repeated investigation and study of the matter in other cases in recent years that there is no substantial or widespread racial discrimination in the selection of grand or petit jurors in this State.

Consequently, we cannot predicate a conclusion that North Carolina juries are, or in recent years have been, more inclined to convict guilty Negroes than guilty white defendants, of crimes for which the death penalty is imposed, on nothing save an assertion to that effect by "enlightened" opponents of the death penalty and a statistical tabulation of convictions classified by race.

Five of the twenty-one individuals sentenced to death in the twelve months since *State v. Waddell, supra,* was announced are white, one is an Indian and fifteen are Negroes. Of the five white men, three were convicted of murder in the first degree, one of burglary in the first degree and of rape and one of rape only. Their appeals have not been heard. As above shown, we have nothing before us or available to us to show how many white defendants or how many Negro defendants, charged with the commission of a capital offense during this twelve-month period, were brought to trial and acquitted or convicted of a lesser, included offense.

Courts can deal only with individuals brought before them on charges of criminal acts. Neither the defendant nor the amicus curiae shows or even suggests that the police officers of North Carolina have discriminated between white and Negro individuals so charged in the matter of arrest or investigation. We know of no provision in the Constitution of the United States which requires police officers, having arrested a Negro rapist or murderer, to arrest no more Negroes so charged until a quota of white murderers and rapists, proportionate to the racial distribution of the population, has been so charged and arrested. Nor are we aware of any provision in the Constitution which requires prosecuting attorneys to defer bringing defendants of one race to trial until members of the other race have been tried for such offenses in proportion to the respective racial population in the area. The experience of this twelve-month period demonstrates clearly that North Carolina juries can and will convict white defendants of capital crimes and North Carolina judges will sentence them to death upon such conviction.

The record of this Court establishes beyond question that such sentences have been, and will be, affirmed when the defendant has had a fair trial in accordance with law. In the seven years the writer of this opinion had been a member of this Court prior to *Furman v. Georgia, supra,* there were before it ap-

peals by twenty-six defendants sentenced to death. Sixteen were Negroes, nine were white and one was an Indian. One was a woman. Ten of the twenty-six were granted new trials by this Court, apart from any action of the Supreme Court of the United States. Of those ten, eight were Negroes and two were white. Thus, of the sixteen death sentences, affirmed by this Court in the seven years prior to *Furman v. Georgia, supra*, eight were imposed upon Negro defendants, seven upon white defendants and one upon an Indian. In those cases, each record was carefully reviewed by each member of this Court, over and beyond the reviews required by the formal assignments of error, just as has been done in the present case. In each of those cases, just as in the present case, the record revealed a cruel, brutal murder or rape, or both, with no extenuating circumstance. Nothing whatsoever in the record of any of those cases, or in the record of this case, offers the slightest justification for the statement, or the suspicion, that the juries of this State have been affected by the race of the defendant in their determination that those defendants, or the present defendant, should be executed. Nothing whatsoever in those records, or in the present record, justifies the suggestion, or a suspicion, that the death sentence in any of those cases, or in this one, was "freakishly" imposed or "freakishly" affirmed.

> **(5)** *Death Is A Cruel And Unusual Punishment Because An "Enlightened" Public Opinion Has Overwhelmingly Repudiated It.*

[24] The brief of the amicus curiae does not define its term, "enlightened." The implication, reasonably drawn from it, is that an "enlightened" person is one who opposes the death penalty. Only on this hypothesis can the statement that "enlightened" public opinion has repudiated the death penalty be found true.

Since *Furman v. Georgia, supra*, was decided on 29 June 1972, according to the brief of the amicus curiae, twenty states, scattered over the entire country, have reinstated capital punishment by legislation. In addition to our own decision in *State v. Waddell, supra*, Delaware has retained the death penalty by judicial decision, holding its "Mercy Statute" severable from its earlier "Murder Statute." *State v. Dickerson, supra*. Thus, there are now twenty-two states which have made some provision, since Furman, to inflict the death penalty for one or more offenses.

According to the dissenting opinion of Mr. Justice Powell in *Furman v. Georgia, supra,* at p. 417, approximately six hundred individuals were in state and Federal prisons, throughout the country, under sentence of death at the time Furman was decided. Many others, including six in North Carolina (one under two death sentences) had had their death sentences reduced to life imprisonment just a short time earlier, by virtue of the decisions of the Supreme Court of the United States in *United States v. Jackson,* 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed. 2d 138, and *Pope v. United States,* 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed. 2d 1317. (See: *State v. Childs,* 280 N.C. 576, 187 S.E. 2d 78; *State v. Roseboro,* 279 N.C. 391, 183 S.E. 2d 108; *State v. Sanders,* 279 N.C. 389, 183 S.E. 2d 107; *State v. Williams,* 279 N.C. 388, 183 S.E. 2d 106; *State v. Atkinson,* 279 N.C. 386, 183 S.E. 2d 106; *State v. Atkinson,* 279 N.C. 385, 183 S.E. 2d 105; *State v. Hill,* 279 N.C. 371, 183 S.E. 2d 97.) As above noted, twenty-one have received sentences of death in this State since 18 January 1973.

The present record shows that fifty prospective jurors were examined by the State. Of these, five were challenged by the State for cause, due to their expressed unwillingness to return a verdict which would necessitate the imposition of the death penalty under any circumstances. Seven others were challenged peremptorily by the State. Assuming that all of these peremptory challenges were due to the Solicitor's misgivings concerning the views of the prospective jurors as to the death penalty, this record shows that only twenty-four per cent of those called for jury service in this case, in Union County, believed that in no case should the death penalty be imposed.

It is thus quite clear, both throughout North Carolina and throughout the nation, that there is widespread opinion that the death penalty is the appropriate punishment for certain crimes. We do not accept the pronouncement by the amicus curiae that this widespread opinion, held by legislators, judges and jurors, is "unenlightened."

(6) *The Punishment Of Death Is Both Cruel And Futile.*

The severity of the death penalty is obvious. For that reason, it has been, and should be, imposed only for the most serious crimes and only when the defendant's guilt of such an offense has been established beyond reasonable doubt.

[25]   The amicus curiae contends that to inflict the death penalty for any crime is futile because such penalty is not the most effective means for obtaining the goals of criminal punishment which it says are: (1) Retribution, (2) moral reenforcement or reprobation, (3) isolation of the offender, (4) reformation and rehabilitation of the offender, and (5) deterrence.

Like Mr. Justice Stewart, in his opinion in *Furman v. Georgia, supra,* at p. 308, we "cannot agree that retribution is a constitutionally impermissible ingredient in the imposition of punishment." The reasonable certainty, or even likelihood of a punishment commensurate with the offense, imposed by the State, is more likely to deter private effort by the family and friends of the victim to "balance the account," than is a policy of correction designed to release the offender in society as soon as possible.

The amicus curiae acknowledges that "moral reenforcement or reprobation doubtless requires that the most serious crimes be punished most seriously." If so, the death penalty is not futile so far as the attainment of this goal is concerned.

"Isolation of the offender" apparently means prevention of further crime by him. The death penalty is certainly not futile in the attainment of this objective.

Reformation and rehabilitation of the offender is obviously cut off by his execution. The present defendant, however, is not a promising prospect for rehabilitation by human punishment of any sort. Before going to trial, he was committed to one of the State hospitals for the insane for the purpose of an examination into his sanity. He was returned for trial with the report, "Without Psychosis (Not Insane)." That evaluation of his mind is not challenged. It is not contended by the appellant or by the amicus curiae that this defendant is lacking in intelligence. Prior to the offenses with which we are now concerned, the defendant was convicted of the murders of two other persons by stabbing them. For these offenses he was imprisoned for a term of years. While serving that sentence, he was permitted to join a national civic society, the Junior Chamber of Commerce, and became the president of a chapter of this society organized within the prison. He was permitted to leave the prison so as to attend a State convention of this organization. He took advantage of this leniency and escaped. Two days later, within a space of less than three hours, he abducted and raped a girl of his own race,

State v. Jarrette

whom he had never seen before, and stabbed to death a complete stranger, a teenager sitting quietly in a parked car, for the sole purpose of stealing the automobile. He callously drove off with the dying boy and abandoned his body in a roadside ditch. When arrested four days thereafter by agents of the Federal Bureau of Investigation, he was carrying, concealed, on his person, another deadly knife, and his only expression of regret was that he had not had an opportunity to kill the arresting officer. The evidence is not convincing that another term in prison would be more efficacious in rehabilitating this defendant.

Whether the imposition of the death penalty in such a case will be futile in deterring others from like acts is, necessarily, a matter of opinion, upon which reasonable minds may and do differ. The steadily rising tide of crimes of the most serious nature, throughout the nation, has occurred in an era of unprecedented permissiveness in our society and of emphasis on sympathy for the accused rather than for his victim and those endangered by him. This is ample basis for reasonable men to conclude that some punishment of exceptionally vicious crimes, other than imprisonment coupled with carefully organized programs for rehabilitation designed to assure the prisoner that he has the sympathy of society, is necessary to bring about the turning of the tide.

Through recent years, the efforts of North Carolina actually to impose capital punishment in the most flagrant instances of vicious crime have been blocked by mandates of the Supreme Court of the United States stemming from *Furman v. Georgia, supra, United States v. Jackson, supra, and Pope v. United States, supra.* We, therefore, do not have recent experience which would support or disprove the contention of the amicus curiae that the carrying out of the death sentence in this instance would be less effective than imprisonment as a means of deterring others from like acts.

It is not, however, the function of this Court to determine the most efficacious punishment for the crimes of murder in the first degree and of rape. That is the function of the Legislature. Nothing in the Constitution of the United States requires that the Legislature prescribe the most efficacious punishment for crime, or even the one favored by "enlightened" sociologists. It is sufficient that reasonable men can believe that the punishment prescribed is reasonably adapted to the attainment of the

goals of all criminal punishment. In our opinion, G.S. 14-17 and G.S. 14-21, as construed by us in *State v. Waddell, supra,* meet this constitutional standard.

We, therefore, reject the contentions of the defendant and of the amicus curiae that the imposition of the death penalty for the crimes of first degree murder and rape is, per se, a violation of the Eighth and Fourteenth Amendments to the Constitution of the United States.

No error.

Chief Justice BOBBITT, with whom Justices HIGGINS and SHARP join, dissenting as to death sentences.

*State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19, was decided 18 January 1973. *All* members of this Court agreed, as stated in the majority opinion, that "the *Furman* decision [*Furman v. Georgia,* 408 U.S. 238, 33 L.Ed. 2d 346, 92 S.Ct. 2726, decided 29 June 1972] holds that the Eighth and Fourteenth Amendments will no longer tolerate the infliction of the death sentence if either judge or jury is permitted to impose that sentence as a matter of discretion." 282 N.C. at 439, 194 S.E. 2d at 25. Waddell's death sentence was *vacated* and his case remanded to the superior court for a judgment of life imprisonment.

*All of us* agreed that *Furman* required this disposition of Waddell's case. However, the majority opinion stated that for crimes of first degree murder, rape, first degree burglary, and arson, committed after 18 January 1973, the date of the *Waddell* decision, punishment by death would be mandatory. In accord with that statement, the majority sustain the death sentences herein. Three of us dissented in *Waddell* and now dissent from that view of the law. We were and are of the opinion that the impact of *Furman* upon our statutes is *to prohibit*—not to require or permit—*the imposition of death sentences until such time as our statutes are amended by the General Assembly.*

The statutes enacted by our General Assembly provide that a person convicted of first degree murder, G.S. 14-17, or of rape, G.S. 14-21, or of first degree burglary, G.S. 14-52, or of arson, G.S. 14-58, shall suffer death *unless* the jury, at the time of rendering its verdict in open court, recommends that the defendant's punishment shall be imprisonment for life in the State's prison. These statutes were rewritten as now codified by Chapter 299,

Session Laws of 1949. The 1949 Act provided: "This Act shall be in full force and effect from and after its ratification, *not excepting trials for offenses committed prior to its ratification.*" (Italics added.) The application of the 1949 Act to offenses committed prior to its ratification is further indication of the General Assembly's intent that punishment by death was not to be imposed unless the jury was given the discretion to recommend that punishment be life imprisonment and failed to make such recommendation. No changes have been made *by the General Assembly* in any of the provisions of G.S. 14-17, G.S. 14-21, G.S. 14-52, and G.S. 14-58, since the 1949 Act.

The majority (4) were of the opinion that the impact of *Furman* was to invalidate the proviso in each of these statutes; and that, upon invalidation of the proviso, the remaining portion provided unconditionally for punishment by death. The minority (3) were of the opinion that the impact of *Furman* was to invalidate *the death penalty provision* of these statutes; and that, unless and until the statutes were amended *by the General Assembly,* the punishment for each of these crimes is life imprisonment.

In *Waddell,* I expressed by dissenting views in these words: "I do not think *any death sentence* may be constitutionally inflicted unless *our General Assembly* strikes from our present statutes the provisions which leave to the unbridled discretion of a jury whether the punishment shall be death or life imprisonment. In my opinion, this Court has no right to ignore, delete or repeal these provisions, which were put there by the General Assembly as an integral part of its plan for the punishment of crimes for which the death sentence was permissible. *Furman* did not repeal them. This Court has no right to repeal them." *State v. Waddell, supra,* at 453-54, 194 S.E. 2d at 31.

In *Waddell,* I reviewed court decisions of Ohio, Mississippi, Louisiana, Oklahoma, Illinois, Pennsylvania, Arkansas, Washington, Virginia, Florida and Texas, relating to the impact of *Furman* upon statutes of those states containing essentially the same provisions as our G.S. 14-17, G.S. 14-21, G.S. 14-52 and G.S. 14-58. Each interpreted *Furman* as holding that no death sentence could be imposed as long as the statute(s) of that state contained provisions which left to the unbridled discretion of a judge or jury whether the punishment would be death or life imprisonment. Later, decisions to the same effect were handed down in Alabama [274 So. 2d 298 (1973)]; Arizona

State v. Jarrette

[506 P. 2d 248 (1973)] ; Kansas [513 P. 2d 248 (1973)] ; Maryland [297 A. 2d 696 (1972)] ; Massachusetts [300 N.E. 2d 439 (1973)] ; New York [300 N.E. 2d 139 (1973)] ; South Carolina [192 S.E. 2d 720 (1972)] ; Tennessee [496 S.W. 2d 900 (1972)].

The majority opinions in *Waddell* and in the present case cite *State v. Dickerson*, Del. Supr., 298 A. 2d 761, the only decision which supports to any extent the views of the majority. I now add to the dicussion of *Dickerson* in my dissenting opinion in *Waddell* the following: Further research discloses a comprehensive revision of Title 11, Parts 1 and 2, of the Delaware Code, was approved by the General Assembly of Delaware on 6 July 1972 and became effective 1 April 1973. 58 Delaware Laws, Chapter 497. The portion of this revision codified as Section 4209 sets forth in detail a new procedure for determining whether the punishment is to be death or life imprisonment upon a plea or conviction of guilty of murder in the first degree committed on or after 1 April 1973. *Dickerson* was decided 1 November 1972. The statutes to which it relates became obsolete on 1 April 1973. *Dickerson* held that first degree murders committed in Delaware during the five (5) months between 1 November 1972 and 1 April 1973 were punishable by death. My research indicates there has been no decision of the Supreme Court of Delaware since *Furman* which sustains a death sentence. Apparently, the four-to-three decision in this case is the only decision since *Furman* which sustains a death sentence under statutory provisions similar to ours.

The majority opinion in the present case states: "All of the members of this Court agreed that, notwithstanding Furman, these statutes remain in the law of North Carolina, in part, and only in part. The difference of opinion among the members of this Court was as to which part of each such statute remained the law of this State, the original provision making death the mandatory punishment, or the proviso, added by the 1949 amendment, which attempted to confer upon the jury the discretion forbidden by Furman." These sentences do not accurately state the views of the minority. In our view, the provisions of these statutes embody an indivisible and unified plan for punishment of the felonies referred to therein. *Furman* did not purport to delete, isolate or invalidate any particular portion of the statute. *Furman* simply held that the death penalty provision under the statutes as now constituted

is invalid and that, absent amendment, no death sentence can
be constitutionally imposed and carried out.

On authority of *Furman,* the Supreme Court of the United
States vacated the death sentences which this Court had sus-
tained in the *Miller, Hamby and Chandler, Chance, Westbrook*
and *Doss* cases; and, pursuant to the mandate of the Supreme
Court of the United States, this Court remanded these cases
for judgments imposing sentences of life imprisonment. For
citations, *see State v. Waddell, supra,* at 453, 194 S.E. 2d at
30-31. *Furman* did not reinstate death as the only permissible
punishment for murder in the first degree, rape, burglary in
the first degree, and arson.

The majority opinion responds to the portions of the briefs
of defendant and of the amicus curiae which urge this Court
to do what the Supreme Court of the United States refused to do
in *Furman,* that is, to hold that punishment by death constitutes
cruel and unusual punishment in violation of the Eighth and
Fourteenth Amendments to the Constitution of the United
States. Being of the opinion that, for the reasons stated herein,
the death sentences must be vacated and the cases remanded
for judgments of life imprisonment, I refrain from discussing
these matters otherwise than by repeating this statement from
my dissenting opinion in *Waddell, viz:* "I agree that the *Fur-
man* decision has not established the proposition that capital
punishment under all circumstances constitutes cruel and un-
usual punishment in violation of the Eighth and Fourteenth
Amendments to the Constitution of the United States. More-
over, nothing in the *Furman* decision would seem to invalidate
a statute of our General Assembly prescribing death as the sole
and exclusive punishment for murder in the first degree, rape,
burglary in the first degree, or arson. Whether such a statute
should be enacted is for legislative determination." 282 N.C.
at 473, 194 S.E. 2d at 43.

Since the provisions of G.S. 14-17 (murder in the first
degree) and G.S. 14-21 (rape) are now the same as when *Fur-
man* was decided, I think the only permissible course is *to
vacate each of the death sentences* and *to remand the cases for
the pronouncement of judgments of life imprisonment.*

Justice SHARP, concurring further in the dissenting opinion of Chief Justice Bobbitt.

To Chief Justice Bobbitt's succinct interpretation of the effect of the *Furman* decision upon our statutes which have specified the punishment for first-degree murder, rape, first-degree burglary, and arson, I can add nothing. He has expressed my views exactly. However, I make the following comments:

In my view the death sentence is not constitutionally impermissible as cruel and unusual punishment for first-degree murder and rape. The question of capital punishment, however, is one of momentous public policy to be determined by the legislature. It is not for this Court to declare either by unanimous decision or four-three division.

In 1949 the legislature, in effect, made the punishment for first-degree murder, rape, first-degree burglary, and arson death or life imprisonment as the jury, in its discretion, might determine. In 1972 the *Furman* decision wrecked that plan by outlawing the imposition of the death penalty under any statute which permitted either judge or jury to impose it as a matter of discretion. On 18 January 1973 this Court, in the four-three *Waddell* decision, completed the destruction of the legislative plan by making the death sentence mandatory for the four crimes when committed after that date. Since these two decisions the legislature has not rewritten the affected statutes. Surely it is time for the General Assembly to exercise its constitutional, legislative prerogative. N. C. Const. art. I, § 6 declares, "The legislative, executive, and supreme judicial power of the State government shall be forever separate and distinct from each other."