STATE OF NORTH CAROLINA v. TIMOTHY WESLEY ROBBINS

No. 42.

(Filed 6 June 1975)

1. Criminal Law § 34— reference to non-testifying defendant's arrest record — no prejudice

Testimony of a police officer concerning an arrest record, though incompetent, did not prejudice defendant where the court sustained defendant's objection and promptly instructed the jury to disregard the statement.

2. Criminal Law § 42— portion of check found on defendant — deceased's name on check — admissibility

The trial court in a prosecution for kidnapping and first degree murder did not err in allowing into evidence a portion of a check found in defendant's pocket at his arrest which bore the name "Osborne," the name of deceased, on the payee line, since the check tended to show some contact between the defendant and the deceased, to identify defendant as the perpetrator of the crime charged, and to corroborate the testimony of police officers, and it was not necessary that the paper writing be authenticated or that its genuineness and execution be proven.

3. Criminal Law § 114— jury instruction — no expression of opinion

Trial court's instruction following the recapitulation of the testimony of each State's witness, "That is what the evidence of this witness tends to show for the State and for the defendant. What it does show is for you, the jury, to say and to determine," did not amount to an expression of opinion in violation of G.S. 1-180 and was not prejudicial to defendant.

4. Constitutional Law § 36; Homicide § 31— first degree murder — death sentence proper

Imposition of the death penalty in a first degree murder prosecution was not cruel and unusual punishment.

Justice COPELAND did not participate in the hearing or decision of this case.

Chief Justice SHARP and Justice EXUM dissenting as to the death sentence.

ON *certiorari* to the Superior Court of GUILFORD County to review judgments of *Copeland, J.*, 28 May 1974 Criminal Session, GUILFORD Superior Court (Greensboro Division).

Defendant was tried on separate bills of indictment, proper in form, charging him with the kidnapping and first degree murder of Bradley Douglas Osborne on 19 January 1974 in Guilford County.

Hugh Douglas Osborne, father of Bradley Douglas Osborne, the deceased, testified that his son Bradley was a student at Wingate College and was on a weekend visit home on Saturday, 19 January 1974. Bradley operated a blue 1973 Gremlin with a black stripe down the side and a stripe across the rear deck. A Wingate College decal was affixed to the rear window of the car. When Bradley came home on this particular Saturday his father put a new 1974 license tag, No. ABF-918, on the Gremlin.

Bradley left his home about 12:50 p.m. to purchase gasoline. At the time, he was wearing a gold Timex watch (State's Exhibit 4). He never returned home, and at 10 o'clock that evening Mr. Osborne reported his son's absence to the police.

Alex Gimpaya testified that he was working at an Exxon filling station between West Market Street and Friendly Road and sold gasoline to the owner of a blue Gremlin about noon on January 19. The customer used a credit card to pay for the gas and signed his name to the receipt. Mr. Gimpaya stated that he wrote the license number ABF-918 on the receipt.

Mr. Gimpaya further testified that the driver of the Gremlin was a young white male; that while he was pumping the gas, a black man approached the driver and talked to him and then circled the car and took a seat beside the driver in the front seat while the witness was placing the credit card in the machine to record the sale. This witness identified defendant as the black man he observed on that occasion and as the man who entered the Gremlin while he was working the credit card machine. When the car left the defendant and the owner were in the car together.

Patrolman T. P. Dolinger testified that as a result of a radio communication he went to the home of Hugh Osborne about 10 p.m. on January 19 and was informed that the son Bradley Osborne had been missing since 1 p.m. that day. Patrol-

man Dolinger put out an alert for the missing person, including information as to the type of vehicle he was driving.

Teresa Louise Martin testified that defendant came to her home on 19 January 1974 between 1:30 and 2:00 p.m. driving a blue 1973 Gremlin and accompanied by his cousin Ronald Stimpson. Defendant invited her to a party that night and she accepted. She got in the Gremlin with defendant and Ronald Stimpson and went to Liberty to see about the party. While riding in the car she observed a tape player and some tapes under the front dash. Upon reaching Liberty she heard one of the boys there ask defendant to let him shoot a gun. She later saw the gun while parked outside Ronald Stimpson's house that night when defendant handed her the gun to hold. She stated that defendant had the gun at the time she left with him and Ronald Stimpson to go to Liberty about 1:30 that afternoon. She also testified that defendant had two watches that day, one of which was gold with an outdated calendar on the watchband which defendant allowed her to wear. She identified this watch as State's Exhibit No. 4. She recalled that on the way back from Liberty that night she, the defendant and Ronald Stimpson stopped on Bothwell Street where defendant went into the woods and later emerged from them running. During the afternoon while defendant and Stimpson were in the Bi-Rite Store and she was alone in the Gremlin, she went through the glove compartment and found a gasoline credit card with the name "Osborne" on it.

Nadine McCain testified that on 19 January 1974 at about 9 p.m. she accompanied Ronald Stimpson to a party in Liberty and they drove to the party in a blue Gremlin with defendant Timothy Robbins and Teresa Martin. After returning from the party to Greensboro, they stopped at a supper club parking lot where Stimpson and defendant went inside. While they were gone, she and Teresa Martin looked in the glove compartment and found an Exxon card with the name "H. D. Osborne" printed on it. Upon leaving the parking lot, defendant drove to Bothwell Street where he entered the woods and later returned. Defendant was carrying a gun at that time.

Grady Stimpson, a cousin of defendant, testified that on the evening of 19 January he went for a ride with defendant in a blue Gremlin car which defendant was driving. During the drive this witness observed tapes in the car, all of which were made by white singers. He also observed that defendant had a

pistol and a shoulder holster with him. Later, back at the Stimpson home, defendant "asked me if I had a body, what would I do with it." The next morning, which was Sunday, defendant came by the home of this witness around 8 a.m. and "asked me again if I had a body, what would I do with it." As the two of them rode around, defendant turned his car on Bothwell Street, which was a dirt road, and said: "I have got something I am going to show you. . . . I done messed up. I done killed a man." The witness then testified that defendant told him he had taken a pair of pants from a store uptown and in trying to get away had asked the man to give him a lift and they became embroiled in an argument and he subsequently killed him. The witness then testified that defendant showed him the body in the ditch off Bothwell Street.

Allen Junior Stimpson, cousin of the defendant, testified that on Saturday morning, 19 January 1974, the defendant showed him a Smith and Wesson .32 caliber pistol and that he rode in the Gremlin which defendant was driving that Saturday night. During the ride he noticed all the tapes in the Gremlin were by white singers and observed on the back window of the car a "Wingate" sticker. This witness further testified that on Sunday morning, January 20, he and defendant took a trip to Charlotte in the Gremlin, and defendant told him that he had shoplifted a pair of pants while some white boy was watching him; that he offered to pay the white boy to drive him away but the white boy drove him to the police station; that he pulled a pistol on the white boy, moved him over to the passenger side, and drove away; that he later shot the white boy and dragged the body into the woods and later put it in a ditch and covered it with leaves and tires. He said, "That is one less whitey when the revolution come."

On 21 January 1974 at 6 p.m. an unidentified caller whose voice sounded like a black male telephoned the Greensboro Police Department and stated that a body was to be found in the ditch under three tires on the right-hand side of Bothwell Street. This information was put on the air; and Detective Larry Bishop, who heard the radio message, went to Bothwell Street and found the body of a white male under four tires stacked on some bushes. He observed the body and saw there was no wristwatch on it. What appeared to be a gunshot wound was in the left chest. The body was removed by ambulance to Moses Cone Hospital.

Dr. Donald D. Leonard testified that on 22 January 1974 he performed a postmortem examination on the body of Bradley Douglas Osborne; that a bullet entered the left breast and that the muzzle of the gun was less than six inches from the body when the gun was fired; that in his opinion the cause of death was a gunshot wound in the chest with secondary loss of blood.

Captain W. H. Jackson, Greensboro police, testified that he arrested Timothy Robbins, with the aid of Charlotte police officers, at Piedmont Community College on 23 January 1974. At the time of his arrest, defendant had a loaded revolver in his belt, a gold colored Timex watch with an outdated calendar on his arm, and in his pocket a portion of a check (State's Exhibit 16) with the word "Osborne" written on it. On 26 January 1974 the Gremlin automobile was found at 2641 Mayfair Avenue in Charlotte, three and one-half blocks from where the defendant resided. The Greensboro police examined the car and, among other things, found an Exxon credit card receipt for three dollars' worth of gasoline with the name "Bradley Osborne" on it. Hugh B. Osborne testified that the signature on the credit card receipt was the signature of his son, Bradley Osborne.

The defendant offered no evidence.

The jury convicted defendant of kidnapping and murder in the first degree. He was sentenced to life imprisonment for kidnapping and to death for the murder. He appealed to the Supreme Court assigning errors discussed in the opinion.

*Rufus L. Edmisten, Attorney General; William W. Melvin and William B. Ray, Assistant Attorneys General, for the State of North Carolina.*

*Wallace C. Harrelson, Public Defender, Eighteenth Judicial District, for defendant appellant.*

HUSKINS, Justice.

[1] Captain W. H. Jackson, one of the investigating police officers, testified that upon his arrival in Charlotte he went to the Charlotte police to obtain, if possible, the address of Timothy Wesley Robbins. He then stated that the address was obtained "from an arrest record of Timothy Robbins." At this point defendant objected and the court, sustaining the objection, in-

State v. Robbins

structed the jury "to disregard anything about an arrest record." Denial of defendant's motion for a mistrial is assigned as error, defendant contending that the officer's statement impeached his character prejudicially in violation of the rule proscribing such evidence when a defendant has not taken the stand.

We said in *State v. Jarrette*, 284 N.C. 625, 646, 202 S.E. 2d 721, 735 (1974):

> "It is, of course, the general rule that upon the trial of a criminal charge, the defendant not having taken the stand as a witness, evidence of his bad character is not competent and, for this reason, the State may not introduce evidence showing that he committed an unrelated criminal offense. [Citations omitted.] However, Agent Phelps' statement inferring that the defendant had escaped from prison was not responsive to the question propounded to him by the Solicitor. Immediately, upon motion of the defendant's counsel, the court properly instructed the jury not to consider this statement. We find in this circumstance no ground for mistrial."

In *State v. McKethan*, 269 N.C. 81, 152 S.E. 2d 341 (1967), defendant was on trial for rape and kidnapping. Defense counsel asked a State's witness if he knew the defendant prior to this incident. The witness replied, "Yes, sir. I have had David for other sex offenses." Upon defendant's objection and motion to strike, the court instructed the jurors not to consider the statement, to erase it from their minds and not to let it influence their verdict in any way. We held the occurrence afforded no grounds for a mistrial.

Captain Jackson's inadvertent reference to defendant's arrest record was incompetent. We hold, however, that the action of the court in sustaining defendant's objection and prompt instruction to the jury to disregard the statement sufficed to remove any possibility of prejudice to defendant. "[O]ur system for the administration of justice through trial by jury is based upon the assumption that the trial jurors are men of character and of sufficient intelligence to fully understand and comply with the instructions of the court, and are presumed to have done so." *State v. Ray*, 212 N.C. 725, 194 S.E. 482 (1938); accord, *State v. Self*, 280 N.C. 665, 187 S.E. 2d 93 (1972); *State v. Moore*, 276 N.C. 142, 171 S.E. 2d 453 (1970). "Ordinarily where the evidence is withdrawn no error is committed." *State v. Strickland*, 229 N.C. 201, 49 S.E. 2d 469 (1948).

A look at the record reveals that defendant's guilt of kidnapping and murder is overwhelmingly shown by competent, untainted evidence. All the evidence and every surrounding circumstance points unerringly to his guilt; and there is no reason to believe that another trial would produce a different result. In some cases, and this is one of them, the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of an erroneous statement is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper evidence is harmless error. *Schneble v. Florida,* 405 U.S. 427, 31 L.Ed. 2d 340, 92 S.Ct. 1056 (1972); *State v. Crowder,* 285 N.C. 42, 203 S.E. 2d 38 (1974). Substantial factual differences distinguish *State v. Aycoth,* 270 N.C. 270, 154 S.E. 2d 59 (1967), relied on by defendant. In our view, the minds of the jurors in this case would not have found the State's case significantly less persuasive had Officer Jackson never referred to an arrest record. Hence, no prejudice resulted. This accords with consistent decisions of this Court that technically incompetent evidence is harmless unless it is made to appear that defendant was prejudiced thereby and that a different result likely would have ensued had the evidence been excluded. *State v. Barbour,* 278 N.C. 449, 180 S.E. 2d 115 (1971), *cert. denied* 404 U.S. 1023, 30 L.Ed. 2d 673, 92 S.Ct. 699 (1972); *State v. Williams,* 275 N.C. 77, 165 S.E. 2d 481 (1969). "Verdicts and judgments are not to be lightly set aside, nor for any improper ruling which did not materially and adversely affect the result of the trial." *State v. Bovender,* 233 N.C. 683, 65 S.E. 2d 323 (1951). This assignment of error is overruled.

[2]   Defendant's second assignment of error relates to the introduction, over objection, of a portion of a check (State's Exhibit 16). Captain Jackson of the Greensboro Police Department testified without objection that State's Exhibit 16 was removed from the pocket of defendant Timothy Robbins in the police department in Charlotte on the night of January 24. This check, or portion of a check, is dated January 18, 1974, has the word "Osborne" showing on the payee line followed by the sum "$35.00." Only the word "five" shows on the line below followed by the printed word "Dollars." The check apparently was drawn on The Stage Door Set and bears the purported signatures of Thomas M. Vance and Donald Martin. No first name or initial of the payee is visible on this portion of the check, and there is no indication that the check was endorsed by the deceased or anyone else. Defendant contends that this

paper writing was never authenticated and its genuineness and its execution were never proven prior to its introduction. He asserts the check was therefore erroneously received into evidence and that its reception was highly prejudicial.

Every circumstance calculated to throw any light upon the crime charged is admissible in criminal cases. *State v. Hamilton,* 264 N.C. 277, 141 S.E. 2d 506 (1965), *cert. denied* 384 U.S. 1020, 16 L.Ed. 2d 1044, 86 S.Ct. 1936 (1966); *State v. Payne,* 213 N.C. 719, 197 S.E. 573 (1938). Articles shown by the evidence to have been used in the commission of a crime are competent and properly admitted into evidence. *State v. Stroud,* 254 N.C. 765, 119 S.E. 2d 907 (1961). "So far as the North Carolina decisions go, any object which has a relevant connection with the case is admissible in evidence, in both civil and criminal trials." 1 Stansbury, North Carolina Evidence § 118 (Brandis rev. 1973). *Accord, State v. Bass,* 249 N.C. 209, 105 S.E. 2d 645 (1958); *State v. Harris,* 222 N.C. 157, 22 S.E. 2d 229 (1942).

Here, there is evidence tending to show that the last name of the deceased is "Osborne"; that this partially mutilated check with the name "Osborne" on the payee line was found in defendant's pocket when he was arrested; that defendant was also wearing a gold Timex watch (State's Exhibit 4) which he showed to Allen Junior Stimpson and stated that he took it "off the boy" together with a billfold containing $30.00 in money. Thus there is evidence tending to show that State's Exhibit 16 has a relevant connection with the case and is competent evidence. It tends to show some contact between the defendant and the deceased and to identify the defendant as the perpetrator of the crime charged. Moreover, it corroborates the testimony of the police officers. Rules of law relating to authentication, genuineness and execution of paper writings have no pertinence in this context. This assignment of error is overruled.

[3] Defendant's next assignment of error is based on Exceptions Nos. 15 through 29. One of these exceptions appears in each instance where the court in its charge, following recapitulation of the testimony of each State's witness, stated: "That is what the evidence of this witness tends to show for the State *and for the defendant.* What it does show is for you, the jury, to say and to determine." (Emphasis added.) Defendant argues that since he offered no evidence the charge "in effect held the

defendant out to the jury as ratifying and confirming almost the entire evidence put on by the State." Moreover, he contends that repetition of the phrase fifteen times "unavoidably and unalterably invaded the province of the jury, and in effect amounted to an expression of opinion on the part of the judge, for which a new trial must be ordered." We now examine the validity of this assignment.

The main purpose of the court's charge to the jury is to clarify the issues, eliminate extraneous matters, and apply the law to the different factual aspects arising upon the evidence. *State v. Jackson,* 228 N.C. 656, 46 S.E. 2d 858 (1948). So long as the judge charges correctly on the applicable principles of law and states the evidence plainly and fairly without expressing an opinion thereon, he has wide discretion in presenting the issues to the jury and is not bound by any stereotyped forms of instruction in doing so. *State v. Mundy,* 265 N.C. 528, 144 S.E. 2d 572 (1965) ; *State v. Biggs,* 224 N.C. 722, 32 S.E. 2d 352 (1944) ; *State v. Howard,* 222 N.C. 291, 22 S.E. 2d 917 (1942).

Here, defendant offered no evidence but relied upon the legal presumption of innocence and the weakness of the State's case. The presumption of innocence goes with him throughout the trial and is not overcome by his failure to testify in his own behalf. "He is not required to show his innocence. The burden is on the State to prove his guilt beyond a reasonable doubt." *State v. Spivey,* 198 N.C. 655, 153 S.E. 255 (1930). And a reasonable doubt may arise from the evidence offered against him, or from a lack of evidence, or from its deficiency. *State v. Hammonds,* 241 N.C. 226, 85 S.E. 2d 133 (1954) ; *State v. Braxton,* 230 N.C. 312, 52 S.E. 2d 895 (1949) ; *State v. Tyndall,* 230 N.C. 174, 52 S.E. 2d 272 (1949).

When the foregoing legal principles are applied to the words in the charge assigned as error, it is apparent that the language complained of is not prejudicial and did not amount to an expression of an opinion in violation of G.S. 1-180. "The charge of the court must be read as a whole . . ., in the same connected way that the judge is supposed to have intended it and the jury to have considered it. . . ." *State v. Wilson,* 176 N.C. 751, 97 S.E. 496 (1918). Although the instruction in question here is not a model to be followed, we perceive nothing in it which would prejudice a mind of ordinary firmness and intelligence. When construed contextually, the charge as a

whole is correct. It presents the law fairly and clearly to the jury and applies it correctly to the different factual aspects of the evidence. Furthermore, "it is a general rule that objections to the charge in reviewing the evidence and stating the contentions of the parties must be made before the jury retires so as to afford the trial judge an opportunity for correction; otherwise they are deemed to have been waived and will not be considered on appeal." *State v. Gaines*, 283 N.C. 33, 194 S.E. 2d 839 (1973). This assignment lacks merit and is overruled.

[4] Finally, defendant contends that imposition of the death penalty is cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments to the Constitution of the United States.

This assignment has been the subject of final judicial determination in this State unless further review is required by legislative enactment or by the Supreme Court of the United States. *State v. Stegmann*, 286 N.C. 638, 213 S.E. 2d 262 (1975); *State v. Honeycutt*, 285 N.C. 174, 203 S.E. 2d 844 (1974); *State v. Dillard*, 285 N.C. 72, 203 S.E. 2d 6 (1974); *State v. Henderson*, 285 N.C. 1, 203 S.E. 2d 10 (1974); *State v. Jarrette*, 284 N.C. 625, 202 S.E. 2d 721 (1974); *State v. Waddell*, 282 N.C. 431, 194 S.E. 2d 19 (1973).

Assignments relating to nonsuit and to the signing of the judgments are formal, requiring no discussion, and are overruled.

Examination of the entire record discloses a senseless killing without provocation and a fair trial free from prejudicial error. The verdicts and judgments must therefore be upheld.

No error.

Justice COPELAND did not participate in the hearing or decision of this case.

Chief Justice SHARP dissenting as to the death penalty:

The murder for which defendant was convicted occurred on 19 January 1974, a date between 18 January 1973, the day of the decision in *State v. Waddell*, 282 N.C. 431, 194 S.E. 2d 19, and 8 April 1974, the day on which the General Assembly rewrote G.S. 14-21 by the enactment of Chapter 1201 of the Ses-

sion Laws of 1973. For the reasons stated by Chief Justice Bobbitt in his dissenting opinion in *State v. Jarrette,* 284 N.C. 625, 666, 202 S.E. 2d 721, 747 (1974)—an opinion in which Justice Higgins and I joined—, I dissent as to the death sentence imposed upon defendant by the court below and vote to remand for the imposition of a sentence of life imprisonment. *See also* the dissenting opinion of Chief Justice Bobbitt, and my concurrence therein, in *State v. Waddell, supra* at 453 and 476, 194 S.E. 2d at 30 and 47.

Justice EXUM dissents from that portion of the majority opinion which affirms the death sentence and votes to remand this case in order that a sentence of life imprisonment can be imposed for the reasons stated in his dissenting opinion in *State v. Williams,* 286 N.C. 422, 439, 212 S.E. 2d 113, 121 (1975), other than those relating to the effect of Section 8 of Chapter 1201 of the 1973 Session Laws.