STATE OF NORTH CAROLINA v. TED LEMUEL CARTER

No. 54

(Filed 17 December 1975)

1. **Bill of Discovery § 1— criminal prosecution — list of State's witnesses**

    Absent a statutory requirement, the defendant in a criminal case is not entitled to a list of witnesses who are to testify against him, and neither former G.S. 15-155.4 nor new G.S. 15A-903 requires this.

2. **Criminal Law § 87; Witnesses § 1— witnesses not on list furnished defendant — photographs not furnished defendant**

    In a first degree murder case wherein the State was ordered to make available to defendant a list of all prospective witnesses for the State and any tangible evidence to be used against him, the trial court did not err in allowing two witnesses whose names had not been disclosed to defendant to testify and in admitting photographs which had not been furnished to defendant where there was no evidence of bad faith on the part of the State, the name of one witness was on file with the clerk as a subpoenaed witness, the name of the second witness appeared on a firearms report furnished defendant, and the photographs were competent only for illustrative purposes.

3. **Criminal Law § 26— recess of trial until following week — unavailability of witness — double jeopardy**

    Defendant was not placed in double jeopardy when his murder trial, which had begun on 6 January, was recessed on 8 January until the next week, the second week of the same session, because of the unexpected inability of a scheduled witness to be present due to his physical condition.

4. **Criminal Law § 76— admissibility of confession — time findings entered in record**

    Defendant was not prejudiced by failure of the court to enter its findings and conclusions on the admissibility of defendant's incustody statement at the time the *voir dire* hearing was held where the *voir dire* hearing was held shortly before the trial was recessed on 8 January, the trial judge announced that he would permit the State to offer the statement into evidence and stated that he would give the reporter his findings and conclusions in writing and put them in the record at the proper time, and the findings and conclusions were placed in the record on the date the trial resumed, 15 January.

**5. Criminal Law § 75— admissibility of in-custody statement**

Defendant's contention that his lack of sleep and food and his heavy use of drugs and alcohol shortly before his periods of interrogation rendered his in-custody statement involuntary is without merit where the court found upon competent evidence that defendant was not interrogated on the evening he was arrested because he was drunk, defendant was not intoxicated from liquor or drugs on the following day when he was interrogated, defendant was twice allowed to buy food during the day of his interrogation and was furnished cigarettes, food and coffee throughout the evening, defendant was questioned in all for a total of only two hours, and defendant signed a written waiver of his rights.

**6. Criminal Law § 90— introduction of defendant's statement by State — showing facts are different**

Introduction by the State of an exculpatory statement made by the defendant does not preclude the State from showing that the facts concerning the crime were different.

**7. Homicide § 21— first degree murder during robbery — introduction of defendant's exculpatory statement — sufficiency of State's evidence**

The State's evidence was sufficient for the jury in this prosecution for first degree murder committed in perpetration of armed robbery of a store proprietor, notwithstanding the State introduced defendant's in-custody statement that he did not intend to rob or kill the store proprietor, that he had no gun, that defendant's companion shot the proprietor after the proprietor had pulled a gun during an argument over payment for cigarettes, and that defendant's companion took money and checks from the store, where other evidence tended to show that defendant had borrowed the murder weapon before the crime, defendant had possession of and hid the murder weapon and the victim's gun shortly after the crime, defendant thereafter attempted to sell the murder weapon, defendant asked a third person a few days before the shooting to help him rob two other stores but the third person refused, shortly after the shooting defendant and his companion were in possession of several hundred dollars and checks which had been cashed at the victim's store, and defendant told his girl friend that he and his companion had killed and robbed the victim.

APPEAL by defendant under G.S. 7A-27(a) from *Ervin, J.,* at the 6 January 1975 Session of GASTON Superior Court.

Defendant was tried and convicted of the first degree murder and armed robbery of Benjamin Stroupe. The mandatory death sentence was imposed for the murder conviction. No sentence was imposed on the robbery conviction.

Evidence introduced by the State tends to show the following: On 30 July 1974 defendant, David "Monkey" Chandler (Chandler) and defendant's girl friend "Cherokee" visited the

home of Milous Holland where defendant borrowed Holland's .32-caliber pistol, purportedly for protection in a poker game. On 2 August 1974, defendant and Chandler were at the Smyre Gang Clubhouse located near Spencer Mountain when Harold Davis arrived around 8:00 a.m. Davis loaned his 1973 red Vega with a white stripe down the side, license number BJZ-388, to defendant and Chandler who left around 8:30 a.m. with defendant driving and returned shortly after noon.

On 2 August 1974, J. H. "Pop" Jordan was operating a store near McAdenville. He opened the store at 10:00 a.m. that day. A few minutes later a red car with a white stripe down the side stopped out front and the two occupants of the car, Chandler and defendant, came in. Chandler wanted to sell Jordan a .22-caliber rifle but Jordan did not need it. Chandler and defendant stayed for a while, leaving around noon.

Around noon on 2 August 1974, Homer Wright was in the vicinity of Ben Stroupe's store in Ranlo. While waiting for the light to change at the intersection where Stroupe's store is located, he had occasion to see defendant and another man walk to the front door of the store and observed that they were unable to enter. As the light changed and he drove on, he saw a red car parked at the corner of the store. He noted three numbers on the license plate—388.

On 2 August 1974, Mrs. Patricia Bingham was stopped at the intersection beside Ben Stroupe's store at about 12:15 p.m. when she saw two males, one being the defendant, come out of the side door of Stroupe's store and speed away in a red Vega with a white stripe.

Around 2:30 or 3:00 p.m. on 2 August 1974, Roy Franklin McGinnis arrived at the Smyre Gang Clubhouse. Defendant and Chandler were already there, holding a large number of one dollar bills which they wanted to exchange for larger bills. At the time, defendant was also playing with a pistol. McGinnis then drove Chandler to various stores and banks where Chandler attempted to cash payroll checks that had already been endorsed with different signatures. Two of these checks had been cashed by Ben Stroupe the night before the killing.

Various law enforcement officers testified that Ben Stroupe's body was found in a pile of newspapers in the store and that death occurred from two .32-caliber bullet wounds in the chest.

Late in the afternoon of 2 August 1974, Paul Bledsoe was at the Smyre Clubhouse where he saw defendant with a .32-caliber pistol that would not fire. Shortly thereafter, defendant was seen hiding the pistol inside an old washing machine behind the clubhouse. Bledsoe retrieved this pistol and later turned it over to the authorities. The pistol was identified as that owned by Ben Stroupe.

Later in the evening of 2 August 1974, defendant was at the home of Donald Terry where he sold Terry a .32-caliber handgun with three cartridges in it, two fired and one unfired. Terry had planned to sell the pistol, but after reading of Mr. Stroupe's death turned it over to the authorities in Ranlo. This pistol was later identified as the murder weapon.

On 4 August 1974, defendant made a statement to J. G. Berrier, an agent of the State Bureau of Investigation, as follows:

"About four A.M. to 4:30 A.M. on Friday, August 2, 1974, I took some MDA by injecting it into myself with a needle and syringe. About twenty minutes before leaving the Smyre Gang Clubhouse at 7:30 that same morning, I snorted some acid. I had drunk beer all night on the preceding Thursday night. Arthur David Chandler, known to me as 'Monkey', and I left the Smyre Gang Clubhouse in a borrowed red Chevrolet Vega belonging to Harold Thomas Davis. 'Monkey' and I first traveled to 'Monkey's' home and obtained a .22 caliber rifle, a pack of cigarettes, and a coat. We next drove to the home of a friend, Chris Christopher who lives in Lowell; but he was not at home. 'Monkey' and I next traveled to Pop's, an establishment located in Mc-Adenville. We arrived at Pop's about nine o'clock a.m. and remained there for about two to two-and-a-half hours playing the pinball machine and some poker. 'Monkey' and I left Pop's and went to Ben Stroupe's store to get a PENTHOUSE magazine. When we arrived at Ben's place, I parked the car at the side entrance to the store and walked to the front door but could not get in that door. Ben Stroupe came to the side door, unlocked it, and let us inside. 'Monkey' and I had walked to the front of the store, but all we saw there were comic books. We asked Ben where the girlie books were located, and he showed us their location. I asked to buy a pack of Kool cigarettes, and Ben went behind the counter to get them. Ben handed me the Kools, and I paid

State v. Carter

him. I continued looking at the magazine until 'Monkey'
said, "Let's go." Then, Ben asked me to pay for the ciga-
rettes, and I told him that I had already paid him. Ben
pulled out a revolver from his right hip pocket, pointed the
gun at me, and began cursing and raising hell. 'Monkey'
told Ben to put the gun up. 'Monkey' grabbed Ben's gun.
I don't know whether 'Monkey' went around or over the
counter. I jumped over the counter and landed on top of
'Monkey' and Ben. The gun which was in Ben's hand went
off. 'Monkey' got up. Ben got up, pointed the gun at me,
pulled the trigger; and it snapped. Ben ran toward the
rear room of the store. 'Monkey' took the gun away from
Ben who was still wanting to fight. Ben moved out of my
line of sight into a rear room. I could see 'Monkey's' back,
but that was about all in that room. I heard another shot
and just about flipped totally out. I didn't want to look
in the back room, but I could see Ben's feet as he lay on
the floor. I ran to the car and about left 'Monkey' behind.
I did not know that he had taken anything from the store
until later when we returned to the clubhouse. 'Monkey'
and I pulled away from the store in the red Chevrolet Vega,
turning to the right off of Cox Road and onto Highway 7.
We pulled up right beside a police car in front of Ben's
Place at this time. I was so afraid that I would not even
look at the police car. Everything was mass confusion in
my mind at this point. We returned to the clubhouse.
'Monkey' and I stayed at the clubhouse about ten minutes
and drank some more beer. We decided to go back to Ben's
Place to wipe our fingerprints off anything we might have
touched inside the store. When we arrived at the store, I
could not make myself go inside. 'Monkey' went inside;
and after he remained there for several minutes, I blew
the car horn twice for him to come outside. He finally
came out with about three paper bags. There were a few
dollars in each of them. We left Ben's Place and traveled
to the American Service Station located across from the
Scottish Inn in Gastonia where we bought two dollars worth
of gas and a case of Budweiser beer. We left this location
and went to the Seven-Eleven Store located on New Hope
Road near Stanley and Dallas. We bought another case of
beer at this location and then returned to the clubhouse.
I don't know what time it was when we returned. 'Monkey'
and I stripped out the contents of the bags, which we had

taken from Ben's Place and burned some of the papers which were in them. A man who was at the clubhouse whose name I don't know but who drives an exterminating truck took 'Monkey' to cash the checks which came from Ben's Place. When 'Monkey' returned from cashing the checks, he gave me some money and one check which he was unable to get cashed. I put the money and check in my back pocket. When I went to bed on Friday night, August 2, 1974, I put the money under the mattress under the bed in which I slept. On Saturday morning, August 3, 1974, I gave four hundred dollars in cash to a friend named Bill whose last name I do not know. Bill is also known to me as 'Pack.' I gave Bill the four hundred dollars because his girl friend needed an abortion. After giving the money to Bill, I had some cash left; but I don't know how much. I told my girl friend, Cherokee, after the incident at Ben's Place that 'Monkey' and I had shot Ben Stroupe and robbed him. She became very moody upon learning what we had done."

Defendant took the stand and his testimony, which closely followed the statement given by him to Agent Berrier, tended to show that he and Chandler had gone to Stroupe's to look at girlie magazines, particularly The Penthouse Annual. He bought a pack of cigarettes and as they prepared to leave, Stroupe accused him of not paying for the cigarettes and pointed a gun at them but it did not fire. Defendant did not have a weapon but dived over the counter onto Stroupe at which time the gun Stroupe had been holding hit the floor and fired. Stroupe got up, holding his chest and said he was going into the back room to get another gun. Chandler followed Stroupe and defendant heard another shot, ran out the door and started the car, waiting for Chandler. He did not intend to rob or kill Ben Stroupe and did not know how he ended up with the cash and checks. He did tell his girl friend Cherokee that he and Chandler had robbed and killed Ben Stroupe.

Further facts pertinent to decision will be discussed in the opinion.

*Attorney General Rufus L. Edmisten by Special Deputy Attorney General William F. O'Connell for the State.*

*Jeffrey M. Guller for defendant appellant.*

State v. Carter

MOORE, Justice.

Defendant first contends that the trial court erred in overruling his motion to strike the testimony of Homer Wright and to suppress the testimony of Fred Hurst, and in allowing the introduction of certain photographs. The record discloses that a district court judge and Superior Court Judge Grist entered orders directing the State to make available to defendant, among other information, a list of all prospective witnesses for the State and any tangible evidence that might be used against him.

The trial judge, upon hearing defendant's motion, found that no photographs had been made available to defendant, that the name of the witness Homer Wright had not been disclosed to defendant but was on file with the clerk of court as a subpoenaed witness, and that the name of witness Fred Hurst had appeared on a firearms report furnished to defendant. Judge Ervin then ruled that the disclosure orders did not clearly indicate that the photographs should be furnished, but if they were included within the scope of the orders they were only competent to *illustrate* the witness's testimony, and that defendant was not prejudiced by their use. Concerning the testimony of Fred Hurst, Judge Ervin ruled that defense counsel's possession of Hurst's signed report provided him with sufficient notice of Hurst's testimony but any additional documents relating to Mr. Hurst should be made available to defendant prior to Mr. Hurst's testimony. The court ruled further that the testimony of Homer Wright was essentially cumulative to the statement of Patricia Bingham which had been provided defendant.

[1, 2]   No right of discovery in criminal cases existed at common law. *State v. Davis,* 282 N.C. 107, 191 S.E. 2d 664 (1972) ; *State v. Goldberg,* 261 N.C. 181, 134 S.E. 2d 334 (1964), *cert. den.* 377 U.S. 978, 12 L.Ed. 2d 747, 84 S.Ct. 1884 (1964). Therefore, absent a statutory requirement, the defendant in a criminal case is not entitled to a list of witnesses who are to testify against him. *State v. Hoffman,* 281 N.C. 727, 190 S.E. 2d 842 (1972). Neither former G.S. 15-155.4 nor new G.S. 15A-903 requires this. Here, however, as in *Hoffman,* an order to supply defendant with certain information had been issued and the State had purported to comply with it. No evidence of bad faith on the part of the State is shown. *See State v. Lampkins,* 286 N.C. 497, 212 S.E. 2d 106 (1975). Thus, the

question presented is whether the omission of the names of Homer Wright and Fred Hurst prejudiced defendant and deprived him of a fair trial. The trial court held not. We agree. Permitting these witnesses to testify and accepting the photographs into evidence were matters within the discretion of the trial judge, not reviewable on appeal in the absence of a showing of an abuse of discretion. *State v. Carey,* 285 N.C. 509, 206 S.E. 2d 222 (1974) ; *State v. Hoffman, supra. See also State v. Anderson,* 281 N.C. 261, 188 S.E. 2d 336 (1972). No such abuse of discretion is shown. This assignment is overruled.

[3]   Defendant next assigns as error the refusal of the trial court to grant his motion to dismiss based on double jeopardy. This trial began on 6 January 1975 with a jury being empaneled, pleas entered, and certain testimony heard. On 8 January 1975, it was determined that one of the State's witnesses, Mr. Fred Hurst, was undergoing surgery and would be unable to testify until the next week. It appears that the district attorney was aware at the trial's inception that this witness was having minor surgery but had been assured that he would be available to testify on either 8 or 9 January.

The trial was then recessed until the next week, the second week of the same session, with the jury being recalled on 15 January. Defendant concedes that the jury was well instructed prior to the temporary recess and questioned upon their return concerning any preconceptions or conclusions they might have reached. Defendant did not object at the time the recess was ordered but before resumption of the trial on 15 January, defendant did object on the ground that if the trial were resumed defendant would be placed twice in jeopardy for the same offense. Jeopardy attaches when a defendant in a criminal prosecution is placed on trial (1) on a valid indictment or information, (2) before a court of competent jurisdiction, (3) after arraignment, (4) after plea, and (5) when a competent jury has been empaneled and sworn to make true deliverance in the case. *State v. Neas,* 278 N.C. 506, 180 S.E. 2d 12 (1971) ; *State v. Birckhead,* 256 N.C. 494, 124 S.E. 2d 838 (1962) ; *State v. Crocker,* 239 N.C. 446, 80 S.E. 2d 243 (1954) ; 2 Strong, N. C. Index 2d, Criminal Law § 26, p. 516. Defendant, in support of this position, relies upon two federal cases and one North Carolina Court of Appeals case. *Downum v. United States,* 372 U.S. 734, 10 L.Ed. 2d 100, 83 S.Ct. 1033 (1963), and *Cornero v. United States,* 48 F. 2d 69 (9th Cir. 1931), each

involved a situation wherein a jury was empaneled but then discharged prior to completion of the first trial and the defendant was then brought to trial at a later date before a newly empaneled and different jury. *State v. Coats*, 17 N.C. App. 407, 194 S.E. 2d 366 (1973), involved a defendant who was charged with drunken driving and brought to trial for the first time in district court. During the trial, the case was continued until a later date in order to give the district attorney time to subpoena an additional witness. At the second trial in the district court, apparently the trial was begun anew with the defendant again entering pleas, etc. These three cases are distinguishable from the case at bar, and the proceedings in them were understandably held to amount to double jeopardy. The simple answer to defendant's contention in present case is that he was not subjected to double jeopardy because he was only subjected to one trial. Here, there was merely a temporary interruption of the trial based upon the unexpected inability of a scheduled witness to be present due to his physical condition. This interruption did not deprive the defendant of his right to a speedy trial, did not cause any arbitrary or oppressive delay and did not handicap the defendant in the presentation of his case. The course and conduct of a trial are matters largely within the discretion of the trial court. *See State v. Cavallaro*, 274 N.C. 480, 164 S.E. 2d 168 (1968); *Shute v. Fisher*, 270 N.C. 247, 154 S.E. 2d 75 (1967); *Cleeland v. Cleeland*, 249 N.C. 16, 105 S.E. 2d 114 (1958). No prejudice to defendant and no abuse of discretion by the court is shown. This assignment is overruled.

[4] The trial court admitted into evidence the statement made by defendant to Agent Berrier concerning the shooting. Defendant contends that its admission was error and, further, that the trial court's findings of fact and conclusions of law were not entered into the record at the proper time. An extensive *voir dire* hearing was conducted immediately prior to the temporary recess on 8 January. The findings of fact and conclusions of law are in the record dated 15 January, the date the trial resumed. It is true, as defendant contends, that in *State v. Doss*, 279 N.C. 413, 183 S.E. 2d 671 (1971), this Court indicated that it was the better practice to make the findings of fact and conclusions of law at some time during the trial, and preferably at the time the statement is tendered and before it is admitted. In this case, prior to entering the order, the trial judge announced that he would permit the State to offer the statement

into evidence and said that he would give the reporter his findings of fact and conclusions of law in writing and put them into the record at the proper time. We find nothing wrong with this procedure and see no prejudice to defendant.

[5] Defendant strenuously contends, however, that his lack of sleep and food and his heavy use of drugs and alcohol shortly before his periods of interrogation rendered any statement involuntary.

After an extensive *voir dire* hearing, the trial court found, in part, that on Friday evening, 2 August 1974, defendant was drunk and was not interrogated at that time because Chief Trull did not believe that he was in condition to be questioned; that on Saturday morning, between 9:00 and 9:30 a.m., 3 August, defendant was in good shape and was not under the influence of intoxicating liquors or drugs; that defendant was not in custody at the time and was allowed to go across the street where he bought some crackers, cookies and a quart of chocolate milk; that on Saturday afternoon defendant was taken to a burger barn where he got some hot dogs and french fries, later took a nap for about one hour, and that throughout the evening he was supplied with cigarettes, food and coffee by the officers; that when the defendant was first questioned, Agent Berrier read him his rights verbatim from a printed form, that he gave defendant a copy of this form and that after his rights were read to him defendant read and signed the waiver of rights; that beginning about 9:00 or 9:30 p.m. and before questioning, Agent Berrier again read defendant his rights and defendant again signed a waiver of rights; that defendant was questioned in all for a total of two hours; that the defendant is twenty-five years old; that he completed the eleventh grade in high school, dropping out his senior year, but that he subsequently obtained a high school diploma by taking the GED examination, and that he also successfully completed a correspondence course in drafting and plan reading and qualified as a union carpenter by passing a written examination; and that he affirmatively and knowingly waived his right to have an attorney present during questioning. These findings of fact were amply supported by competent evidence, and so supported are binding on appeal. *State v. Thompson,* 287 N.C. 303, 214 S.E. 2d 742 (1975); *State v. Pruitt,* 286 N.C. 442, 212 S.E. 2d 92 (1975); *State v. Bishop; State v. Baskin; State v. Thompson; State v. McCain,* 272 N.C. 283,

158 S.E. 2d 511 (1968). Based upon the findings of fact, the court concluded that defendant was fully advised of his rights in accordance with the *Miranda* warnings, and that the statements made by the defendant were freely, understandingly and voluntarily made and were not induced by any coercion, duress, threats, undue influence or promises of leniency. We agree with the trial judge's conclusions that the pretrial statement was freely, understandingly and voluntarily made and was therefore properly admitted into evidence.

**[6, 7]** Defendant next assigns as error the denial of his motion for judgment as of nonsuit. Specifically, he contends that he comes within the purview of the rule stated in *State v. Bolin*, 281 N.C. 415, 189 S.E. 2d 235 (1972), that " '[w]hen the State introduces in evidence exculpatory statements of the defendant which are not contradicted or shown to be false by any other facts or circumstances in evidence, the State is bound by these statements.' *State v. Carter*, 254 N.C. 475, 479, 119 S.E. 2d 461, 464 (1961), and cases cited. [Citations omitted.]" However, it is equally well established that the introduction by the State of an exculpatory statement made by the defendant does not preclude the State from showing that the facts concerning the crime were different. *State v. Bolin, supra; State v. Cooper*, 273 N.C. 51, 159 S.E. 2d 305 (1968); *State v. Bright*, 237 N.C. 475, 75 S.E. 2d 407 (1953). On motion for judgment as of nonsuit the evidence must be considered in the light most favorable to the State and the State must be given the benefit of every reasonable intendment thereon and every reasonable inference to be drawn therefrom. Contradictions and discrepancies even in the State's evidence are matters for the jury and do not warrant nonsuit. *State v. Bolin, supra; State v. Murphy*, 280 N.C. 1, 184 S.E. 2d 845 (1971); *State v. Cutler*, 271 N.C. 379, 156 S.E. 2d 679 (1967).

When the evidence in this case is so considered, the jury could find the following facts despite certain statements to the contrary by defendant:

(1) Defendant borrowed the murder weapon on Tuesday, 30 July 1974.

(2) Defendant had possession of the murder weapon and the victim's weapon on the afternoon of 2 August 1974 when he was seen hiding them in an old washing machine behind the clubhouse.

(3) Defendant sent his girl friend Cherokee to retrieve the murder weapon from its hiding place in order to sell it to Donald Terry. Terry, upon cleaning the pistol, found that it had been fired twice.

(4) Defendant had asked one Bill Pack a few days before the shooting to help him rob "Pop's" and another store in McAdenville but Pack refused.

(5) Defendant and Chandler were in possession of several hundred dollars on the afternoon of 2 August 1974 and several payroll checks that had already been endorsed, at least two of which were identified as having been cashed at Stroupe's Place the night before the shooting.

(6) Defendant admitted telling his girl friend Cherokee that he and Chandler had "killed and robbed Ben Stroupe."

We find the evidence presented by the State sufficient to carry the case to the jury on the murder charge contained in the bill of indictment. Defendant's motions for judgment as of nonsuit were properly denied.

Defendant's final contention that the imposition of the death penalty results in cruel and unusual punishment and is therefore constitutionally impermissible has been rejected by this Court in many recent decisions, including *State v. Robbins,* 287 N.C. 483, 214 S.E. 2d 756 (1975) ; *State v. Stegmann,* 286 N.C. 638, 213 S.E. 2d 262 (1975) ; *State v. Honeycutt,* 285 N.C. 174, 203 S.E. 2d 844 (1974) ; *State v. Dillard,* 285 N.C. 72, 203 S.E. 2d 6 (1974) ; *State v. Henderson,* 285 N.C. 1, 203 S.E. 2d 10 (1974) ; *State v. Jarrette,* 284 N.C. 625, 202 S.E. 2d 721 (1974) ; *State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19 (1973). We adhere to those decisions.

Our careful search of this entire record discloses no error warranting a new trial.

No error.